SANBORN PLASTICS CORPORATION, Appellee,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Appellant.

[Cite as *Sanborn Plastics Corp. v. St. Paul Fire & Marine Ins. Co.* (1993), 84 Ohio App.3d 302.]

Court of Appeals of Ohio,
Geauga County.

No. 91–G–1668.

Decided Jan. 4, 1993.

Joseph R. Znidarsic and Paul J. Dolan, for appellee.

Stephen M. Kelley and Timothy J. Clarke, for appellant.

CHRISTLEY, Judge.

This is an appeal from a decision of the Geauga County Court of Common Pleas, granting partial summary judgment in favor of both parties on one of the three claims set forth in the complaint of appellee, Sanborn Plastics Corp. As to this claim, the trial court also held, pursuant to Civ.R. 54(B), that there was no just cause for delay. The two remaining claims are still pending before the trial court at this time.

Appellee is an Ohio corporation, which has its primary place of business located in Geauga County. As its name indicates, appellee is engaged in the production of plastic molding. As part of its manufacturing process, appellee's employees operate certain machines which use hydraulic oil as a lubricant. Once it has been used, this oil leaks into catchpans built into the machines. The used oil is then collected and placed into an aboveground storage tank on the premises of appellee's plant.

Prior to 1978, appellee periodically gave its used oil to the Huntburg Township Maintenance Department. After the township stopped taking the oil, appellee entered into an agreement to sell the used oil to the Poplar Oil Company. At the time of this agreement, Poplar Oil was engaged in the business of collecting and recycling of waste oils for use as road oil and dust control agents. Poplar Oil was owned and operated by Alvin Laskin, who also operated the same business, at different times, under the names "Laskin Waste Oil Service" and "Sun–Ray Recycling."

As part of his business, Laskin maintained a waste oil facility on an eighteen-acre parcel of land in Ashtabula County, Ohio. The facility consisted of approximately forty tanks of various capacities. These tanks were of both the aboveground and in-ground variety, and were made of various materials. Some of these tanks were connected by a system of pipes, hoses, pumps, and other equipment. Laskin used this system to recycle the used oils which he collected from various industrial and commercial clients.

Beginning in December 1978, appellee sold its used oil to one of Laskin's companies on five occasions. The final transaction was made in October 1981. In the first three transactions, appellee sold the oil to Poplar Oil. The last two

transactions were with Sun–Ray Recycling. Over the three-year period, Laskin's companies purchased an estimated 3,700 gallons of used hydraulic oil from appellee.

From October 1975 until October 1984, including the period in which it was dealing with Laskin, appellee was insured under four separate policies issued by appellant, St. Paul Fire and Marine Insurance Company. The first three of these agreements were multi-coverage policies, while the fourth was an umbrella excess liability policy. Each of the policies contained provisions that essentially stated that appellant would cover any amount appellee would be legally obligated to pay for bodily injury or property damage as a result of an "occurrence" or an accident. The first three policies also had a provision which excluded coverage for injuries or damages caused by pollution.

For example, under the comprehensive general liability protection section in the second policy, which covered the majority of the period in which appellee was dealing with Laskin's companies, appellant agreed to pay any "claims for bodily injury or damage to tangible property resulting from an accidental event." As to pollution exclusion, the second policy stated, in pertinent part:

"We won't cover liability claims for injury or damage caused by the continuous or intentional discharge or release of pollutants such as: Smoke. Vapors. Soot. Fumes. Acids. Alkalis. Toxic chemicals, liquids or gases. Or waste materials. But we will cover sudden accidents involving these pollutants."

In addition to the foregoing, each policy also stated that appellant agreed to represent appellee in any lawsuit brought against it, and to cover any amount incurred as a result of the litigation.

In April 1982, appellee received a letter from the United States Environmental Protection Agency concerning the Laskin waste facility. This letter stated that the EPA had determined that an actual release of a hazardous substance, or a substantial threat of such a release, had recently occurred at the facility, and that appellee had been named as one of the parties that would be secondarily responsible for the clean-up. The letter further informed appellee that if it refused to participate in the clean-up, a legal action might be initiated against it under federal law.

Upon reviewing the situation, appellee decided not to inform appellant of the letter. This decision was based upon the determination that the potential for liability was not significant.

Approximately two years later, in June 1984, the United States initiated an action in an Ohio federal district court against Laskin and seven other corporations. Brought pursuant to the enforcement sections of three federal environmental statutes, the complaint essentially sought the recovery of funds which the

federal government had expended during the first two phases of the clean-up. As to the cause of the damages, the complaint alleged that the release or discharge of the hazardous substances had occurred over a four-year period. The complaint further alleged that on November 13, 1980, there had been a discharge of oil and other substances from the Laskin facility into a nearby creek.

Appellee was not named as a defendant in the original complaint. However, in July 1986, appellee was named as a defendant in a third-party action filed by the corporate defendant in the original action. The third-party complaint alleged that the third-party defendants, including appellee, had, *inter alia,* arranged for the disposal or treatment of hazardous substances at the Laskin facility, and therefore had contributed to the damages caused by the release of the substances. For relief, the third-party plaintiffs sought contribution for all or part of the damages for which they may become liable.

In April 1988, after having received another letter from the EPA concerning the continuing clean-up of the site, appellee notified appellant of the third-party complaint, and asked appellant to represent it in the action. After not receiving a response from appellant for over sixteen months, appellee initiated the instant declaratory judgment action.

Under its first claim, appellee sought a declaration of the parties' rights under the four policies. Specifically, appellee sought an order requiring appellant to provide a defense in the third-party action, and also to indemnify it for any damages for which it may become liable. Under its remaining two claims, appellee sought damages covering the costs it had incurred as a result of representing itself in the third-party action, and the costs incurred in bringing the instant action.

Once it had initiated this action, appellee received two more letters from the EPA. In these letters, the EPA again stated that additional costs had been incurred by the government, and that appellee was still considered a responsible party. Based upon these letters, appellee amended its complaint.

Once appellant had answered, the parties engaged in prolonged discovery. Finally, in June 1991, the parties filed competing motions for summary judgment on appellee's complaint. Appellee's motion was based upon two of the four policies, covering the period from October 1978 to October 1984. Along with their motions, both parties filed numerous evidentiary materials to support their respective positions.

After both parties had filed response briefs, the trial court issued the aforementioned judgment. As to the first claim, the court held that under the policies, appellant had the duty to defend and indemnify appellee with respect to the pending third-party action. However, the court held that appellant was not

required to defend appellee with respect to any administrative action the EPA was taking in relation to the last two letters.

As to the issue of damages under appellee's last two claims, the court concluded that appellant had to pay the costs of both the third-party action and the instant action. The court then delayed the determination of these damages until a later date. After this appeal had been filed, the court further delayed the determination of damages until a decision is rendered in the instant appeal.

On appeal from the granting of partial summary judgment in appellee's favor, appellant has assigned the following as error:

"1. The trial court erred as it did not grant St. Paul summary judgment due to Sanborn Plastics' late notice of its potential liability for the contamination of the Laskin site, prejudicing St. Paul in several respects, and breach of express conditions in each of the Sanborn–St. Paul insurance contracts.

"2. The trial court erred as it did not grant St. Paul summary judgment in that the transactions between Sanborn Plastics and Laskin/Poplar did not constitute either an 'occurrence' or an 'accidental event' as defined by and within the scope of the Sanborn–St. Paul insurance contracts.

"3. The trial court erred as it did not grant St. Paul summary judgment as each Sanborn–St. Paul contract excludes property damage caused by pollution from the scope of the insurance contracts.

"4. The trial court erred in finding St. Paul has a duty to defend and a duty to indemnify up to the contract limits under contracts 634NA7558, 634NB6415 and 534XD0036 as no 'occurrence', 'accidental event', or 'property damage' took place during the effective periods of these contracts.

"5. The trial court erred in finding St. Paul has duties to defend and to indemnify Sanborn as there is no suit for legal damages nor has Sanborn become legally obligated to pay any sums as damages.

"6. The trial court erred in holding that Sanborn is entitled to recover costs, expenses and attorneys' fees in its declaratory judgment action."

■ In each of the first three assignments in this appeal, appellant challenges the merits of the trial court's basic holding concerning the obligation to defend and indemnify. In doing so, appellant is essentially restating the same points which it advanced in moving for summary judgment. Under its first assignment, appellant submits that summary judgment should have been granted in its favor because appellee failed to give it proper notice of the underlying action. Appellant specifically contends that the trial court's rejection of this argument was erroneous because appellee failed to show that appellant was not prejudiced by the delay.

As appellant correctly notes, each of the four policies between the parties contained some type of language as to the duty of appellee to give notice of accident or lawsuits that might be covered under the policies. For example, in the two policies upon which appellee based its motion for summary judgment, appellee was required to give notice of any incident or accident as soon as possible. The policies also required appellee to send appellant copies of all legal documents whenever appellee was sued. The other two policies contained similar language concerning notice of both occurrences and pending lawsuits.

Despite these requirements, a review of the evidentiary material submitted by both parties indicates that even after receiving service of summons on the third-party complaint in August 1986, appellee did not give appellant any notice of the litigation until April 1988. Both before this court and at the trial level, appellee does not dispute the fact that the nineteen-month delay rendered its notice untimely. Instead, appellee contends that it was still entitled to a defense under the policies because appellant was not prejudiced by the delay.

In relation to the issue of prejudice, the Ohio Supreme Court has held that *unreasonable* delay may be presumed to be prejudicial in the absence of contrary evidence. *Ruby v. Midwestern Indemn. Co.* (1988), 40 Ohio St.3d 159, 532 N.E.2d 730. Taking this one step further, this court has recently held:

"It is now well settled that untimely notice is rebuttably presumed to be prejudicial to the insurer, and the insured bears the burden of producing evidence sufficient to rebut the presumption of prejudice." *Ohio Cas. Ins. Co. v. Joseph Sylvester Constr. Co.* (Sept. 30, 1991), Trumbull App. No. 90–T–4439, unreported, at 17, 1991 WL 206628.

As indicated in the foregoing quotation, the insured has the burden of going forward with the evidence to rebut the presumption of prejudice. *Zurich Ins. Co. v. Valley Steel Erectors, Inc.* (1968), 13 Ohio App.2d 41, 43, 42 O.O.2d 109, 110–111, 233 N.E.2d 597, 598–599. Once such evidence has been given, the trier of fact must determine the weight and sufficiency of such evidence. *Id.* As a result, this issue is not one which can readily be determined in a summary judgment exercise.

In moving for summary judgment, appellee attached to its motion copies of the docket in the underlying action. Appellee contends that the docket showed that very little occurred in furtherance of the litigation process during the nineteen-month delay between service of summons and service of notice to appellant. Appellee also contends that the docket established that appellant had adequate time to investigate the situation.

As these evidentiary materials tended to show that no action had occurred in the litigation which might have prejudiced appellant's position, appellee clearly

met its burden of going forward with some evidence to rebut the presumption. However, these materials did not address other important issues, such as whether appellant would have the opportunity to investigate the Laskin facility.

Thus, while appellee's materials were sufficient to raise a genuine factual issue concerning whether appellant was prejudiced by the delay, they were not sufficient, as a matter of law, to rebut the presumption. Since a genuine issue of fact remained, neither party was entitled to summary judgment on this point. Civ.R. 56(C). This first assignment is well taken.

■ In addition to asserting that appellee had failed to give it timely notice of the underlying action, appellant also maintained in its summary judgment motion that it was not obligated to provide a defense because coverage had not been triggered by an "occurrence" or "accidental event." As to this point, appellant argues that appellee's actions in handling the hydraulic oil at its plant, and then selling the oil to Laskin, did not constitute an "occurrence" or an "accidental event." Under its second assignment, appellant contends that the trial court erred in rejecting this aspect of its motion.

As was noted above, appellee was covered under four separate policies over a nine-year period. In two of these policies, coverage for damages which appellee became legally obligated to pay was contingent upon whether the bodily injury or property damage had resulted from an "occurrence." The first policy defined this term in the following manner:

" 'Occurrence' means an accident, including continuous or repeated exposure to condition, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured * * *."

The fourth policy also used the term "occurrence." In this policy, the term was defined as an "event" which causes bodily injury or property damage. Like the definition in the first policy, this second definition also required that the resulting damage had to be neither expected nor intended from the standpoint of appellee.

The second and third policies did not employ the term "occurrence." Instead, these policies provided that the bodily injury or property damage had to be the result of an "accidental event." Neither of these policies defined this particular term. However, as it is commonly used, the word "accidental" typically refers to something which was not expected or intended. See *Waste Mgt. of Carolinas, Inc. v. Peerless Ins. Co.* (1986), 315 N.C. 688, 340 S.E.2d 374. Thus, the meaning of the word is similar to that which was given to the term "occurrence" in the other two policies.

■ In arguing that the trial court did not properly apply the foregoing terms to the facts of this case, appellant argues that it was appellee's handling of the oil

which must be judged in determining whether an "occurrence" or "accidental event" has taken place. However, under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, appellee's actions are irrelevant, since the Act establishes an absolute liability standard. Section 9607(a), Title 42, U.S.Code states:

"(a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

" * * *

"(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances * * *

" * * *

" * * * shall be liable for—

"(A) all costs of removal or remedial action incurred by the United States government or a State not inconsistent with the national contingency plan;

" * * *

"(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release."

Under this statutory scheme, any company which gives its waste materials to another entity to transport to a disposal site, can be held liable for any damages which occur after the waste has been transferred. Accordingly, the key events for determining whether an "occurrence" or "accidental event" has taken place include those which take place at the disposal site. As to the issues of this case, the only facts which are relevant, according to the cited code sections, are those which took place *after* the oil was transferred from appellee's control to the Laskin site.

In the original complaint in the underlying action, the general allegation is made that hazardous substances were released or discharged from the Laskin site over a four-year period. Nowhere in the complaint is it stated or implied that these releases were, in any way, intended or expected by Laskin and Poplar Oil. Moreover, the complaint alleges that damage to the land and environment had resulted from the releases. Thus, the original complaint does state an event which arguably constitutes an "occurrence" or "accidental event." Under this analysis, appellant's second assignment is without merit.

In its next assignment, appellant contends that even if a covered claim was alleged, such coverage should have been excluded under the pollution exclusion in each of the four policies. Specifically, appellant asserts that the trial court should have concluded that since the complaints in the underlying action did not allege that the releases happened suddenly, the exclusion was applicable to any damages for which appellee may be liable. This argument is well taken in part.

As noted above, three of the four policies at issue contained a variation of the standard pollution exclusion. This provision essentially stated that coverage under the policy does *not* extend to damages which result from the release or discharge of pollutants into land, water, or air. The provision also stated an exception to the exclusion, *i.e.*, coverage will be extended if the release or discharge is sudden.

The meaning of the term "sudden" in the exception has been the subject of considerable litigation in this country. In Ohio, one appellate district has held that "sudden" should be interpreted to simply mean "unexpected." *Buckeye Union Ins. Co. v. Liberty Solvents & Chem. Co.* (1984), 17 Ohio App.3d 127, 17 OBR 225, 477 N.E.2d 1227. Under this interpretation, both a prolonged, as well as an abrupt, release of pollutants would be covered under the exception to the exclusion.

However, in *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St.3d 657, 597 N.E.2d 1096,[1] the Ohio Supreme Court expressly rejected the holding in *Buckeye Union,* and concluded that "sudden" has a temporal aspect. Specifically, the court held that as it is commonly used, the word "sudden" means " * * * happening quickly, abruptly, or without prior notice." *Id.,* 64 Ohio St.3d at 666, 597 N.E.2d at 1102. Based upon this, the court further held: " * * * The inclusion of the word 'sudden' readily indicates that the exception was not intended to apply to a release that occurred over an extended time." *Id.* at 667, 597 N.E.2d at 1103.

---

1. Following oral arguments in this case, appellee filed a supplemental brief concerning the *Hybud* decision. In this brief, appellee argues, *inter alia,* that *Hybud* is not binding upon this court because that decision does not contain a syllabus.

   While it is correct that the syllabus of a Supreme Court decision states the controlling point of law arising from the decision, the holding in *Hybud* is still binding upon this court under the general principles of *stare decisis* and appellate procedure. As to this point, we would note that *Hybud* was a unanimous decision. Moreover, the wording of *Hybud* does not support the conclusion that the court would apply a different analysis to the policies in the instant case.

   Nonetheless, we would also note that appellee's argument as to the proper application of *Hybud* to this case has been fully considered by this court in rendering this opinion.

In the underlying action between the United States and Laskin, the complaints essentially alleged that certain hazardous substances, including oil, had been released from the Laskin facility. This allegation was readily sufficient to invoke the pollution exclusion in the policies.

As to whether the releases occurred "suddenly," the original and amended complaints contained conflicting allegations. In one paragraph, the complaints alleged that the releases had continued over, at least, a four-year period, beginning in December 1980. Three paragraphs later, the complaints then stated: "On or about November 13, 1980, there was a discharge of oil and/or hazardous substances from the Laskin site into adjoining Cemetery Creek."

The complaints do not provide any description of the nature of the November 1980 release. As a result, it cannot be determined from the complaints whether this particular release was inherently different from those which allegedly began to occur one month later. However, the fact that the November 1980 release was alleged in a separate paragraph at least insinuates that it was not the same as those which happened over the subsequent four-year period.

Obviously, a series of releases which supposedly took place over four years cannot be deemed to have happened suddenly under the *Hybud* standard; thus, the exception to the pollution exclusion would not be applicable to these particular occurrences. But a release of pollutants which occurred on one specific day, and which was not a part of the series of releases, potentially could have been a "sudden" release which would be covered under the policies.

In *Hybud,* the Supreme Court held that the exception to the exclusion was inapplicable in that case because " * * * there was never any allegation that the release or discharge of the waste happened abruptly or instantaneously." *Id.,* 64 Ohio St.3d at 667, 597 N.E.2d at 1103. In contrast, the underlying complaints in the instant appeal contain at least one allegation which infers that a separate release *may* have occurred suddenly. Accordingly, this court concludes that the exception to the pollution exclusion was conceivably applicable to the release of November 1980.

Of course, if further investigation into the basis of the underlying complaints later indicates that the nature of the November 1980 release was the same as the subsequent releases, appellant could still maintain under the pollution exclusion that it is not obligated to indemnify appellee for *any* of the damages for which the company may be liable. See *Willoughby Hills v. Cincinnati Ins. Co.* (1984), 9 Ohio St.3d 177, 180, 9 OBR 463, 466, 459 N.E.2d 555, 558, at fn. 1. However, in determining whether appellant had a duty to defend appellee in the underlying

action, the allegations in the underlying complaints are controlling in this particular case.[2]

Having determined that the exception to the pollution exclusion *may* be applicable to the November 1980 release, but not to the releases after December 1980, the next issue before this court concerns the extent of appellant's duty to defend appellee. Stated differently, given that the allegations in the underlying complaint support the conclusion that appellant must defend appellee as to the November 1980 release, is appellant required to defend on the entire complaint?

As a general proposition, courts in other jurisdictions have held that if one claim in a complaint falls within the coverage of a policy, the insurer must defend the entire lawsuit. See, *e.g., Montgomery Elevator Co. v. Bldg. Eng. Serv. Co., Inc.* (C.A.5, 1984), 730 F.2d 377; *Golotrade Shipping & Chartering, Inc. v. Travelers Indem. Co.* (S.D.N.Y.1989), 706 F.Supp. 214. The Ohio Supreme Court has apparently limited the application of this rule:

"When a complaint against an insured states both negligence and intentional tort claims that are based upon the *same occurrence,* the insurance company that is contractually obligated to defend the insured in negligence actions is required to make a defense as to both claims against the insured, regardless of the ultimate outcome of the action or the insurance company's ultimate liability to the insured." (Emphasis added.) *Preferred Mut. Ins. Co. v. Thompson* (1986), 23 Ohio St.3d 78, 80, 23 OBR 208, 209–210, 491 N.E.2d 688, 690.

From this holding, it follows that if the claims arise from separate occurrences, the insurer is only obligated to defend the claim that is covered under the policy.

As noted above, the allegations in the underlying complaint insinuate that the November 1980 release was different from the subsequent releases. Under this scenario, the November 1980 release would be a separate occurrence, in the context of both the policies and the underlying complaint.

The underlying complaint in this case did not contain separate claims for each of the alleged releases; instead, the complaint contained only one claim for relief, seeking to recover the funds expended to clean-up *all* of the damages caused by the releases. Nevertheless, since our conclusion that appellant is obligated to defend appellee is predicated upon the fact that the November 1980 release *may*

---

**2.** As to this point, we would note that under the policies at issue, appellant agreed to represent appellee in any suit for damages covered by the policies, "even if the suit is groundless or fraudulent." An inference can be drawn from the language used by the Supreme Court that when a policy contains the "groundless or fraudulent" phrase, a trial court in a declaratory judgment suit cannot consider any evidence other than the underlying complaint in determining the duty-to-defend issue. See *Preferred Risk Ins. Co. v. Gill* (1987), 30 Ohio St.3d 108, 114, 30 OBR 424, 429, 507 N.E.2d 1118, 1123.

be distinct from the subsequent releases, it follows from *Thompson* that appellant's duty to defend is limited to that particular release. In other words, since the duty to defend would not arise in this case unless the November 1980 release constitutes a separate occurrence, appellant's obligation extends only to that occurrence. Although this holding may present some practical difficulties for appellee in defending itself in the underlying action, any further extension of the duty to defend would violate the specific requirements of the policies.

In concluding that appellant had to defend appellee in the entire underlying action, the trial court rejected the argument that coverage under the policies was not excluded under the pollution exclusion. To the extent that the court found that the exclusion was not applicable to the series of releases which occurred after November 1980, the court's judgment was incorrect. Pursuant to our discussion, if the trial court ultimately concludes that appellant was not prejudiced by the delay in notice, then appellant is obligated to defend appellee only on that part of the underlying complaint which pertains to the November 1980 release. The third assignment is well taken in part.

Next, appellant submits that the trial court erred in concluding that it had a duty to defend and a duty to indemnify under all four policies. Appellant submits that the court should have found this duty only under the single policy which covered the period from October 1978 until October 1981. As to the other policies, appellant maintains that these policies were not applicable because, according to appellant, no "occurrence" or "accidental event" took place during the period in which they were effective.

In relation to this issue, we would note that appellant moved for summary judgment only as to the second and third policies. These policies were effective from October 1978 until October 1981, and from October 1981 to October 1984, respectively. As to the latter period, the only one in dispute, we would emphasize that the original complaint in the underlying action stated that the releases had continued at least through 1984. The mere fact that appellee had not sold any oil to Laskin since 1981 was not controlling. Rather, as discussed in the second assignment, the dates when the oil was released were the dates which constituted the "event."

Also under this assignment, appellant contends that summary judgment in appellee's favor was incorrect because appellee never presented any evidence showing that the oil it sold to Laskin was taken to the waste facility at issue. As to this point, we would agree with appellee that allegations in the underlying complaints are controlling. The summary judgment exercise did not address the issues raised in the third-party complaint. Rather, the motion addressed the duty to defend and indemnify. Since the underlying complaint alleged that the hazardous materials had been taken to the facility, the claims were sufficient to

require appellant to defend appellee in the underlying action. Appellant's arguments offer a defense on the merits of the complaint, not the issues raised on summary judgment. Therefore, appellant's fourth assignment is without merit.

█ In its next assignment, appellant again contends that the trial court erred in concluding that it was required under the policies to provide a defense for appellee. Here, appellant submits that there was no duty in this instance because the underlying action was not for "damages," as that term is used in the policies. Stated differently, appellant argues that there was no coverage, as environmental clean-up costs do not constitute legal damages for which an obligation to pay arises.

In support of this argument, appellant emphasizes that each of the policies stated that it would pay all sums which appellee shall become *legally* obligated to pay as damages. Noting the use of the words "sums" and "damages," appellant then contends that the obligation to pay applies only to legal damages, as compared to equitable relief.

Also in support, appellant cites a number of cases from other jurisdictions which hold that environmental clean-up costs are not covered because they are restitutional in nature and, accordingly, constitute equitable relief. See, *e.g.*, *Verlan, Ltd. v. John L. Armitage & Co.* (N.D.Ill.1988), 695 F.Supp. 955. These courts emphasize that under the policy language, the insurer does not agree to pay all "sums," but only those which constitute "damages," as the latter term is usually defined. *Continental Ins. Co. v. Northeastern Pharmaceutical & Chem. Co.* (C.A.8, 1988), 842 F.2d 977.

As to this point, this court would note that under the policies at issue, appellant agreed to pay all claims covering "bodily injury" or "property damages." Each policy then defines the latter term as "physical injury to or destruction of tangible property."

In interpreting the term "tangible property" in favor of the insured, at least one appellate district has held that the term includes all land or water, regardless of whether it is publicly or privately owned. *Kipin Industries, Inc. v. Am. Universal Ins. Co.* (1987), 41 Ohio App.3d 228, 535 N.E.2d 334. Based upon this, the *Kipin* court further held that the term "property" included the interests of the government "in the tangible environment and its safety." *Id.* at 230, 535 N.E.2d at 337. Thus, the court concluded that when government action is needed to stop harm to the environment, there has been "property damage" which is covered under the policy.

Although the *Kipin* logic appears to be somewhat strained, its ultimate conclusion is supported by the policy language. As to this point, it should be noted that if a nearby resident were asserting a claim for property damage as a

result of pollution, it would be covered under the policy. In many respects, the claims of the government and the individual are similar, in that each seeks recovery of funds needed to correct the harm caused by the pollution. The language does not support a distinction between the two claims. Thus, this court also concludes that the costs for environmental clean-up constituted "damages" under the instant policies and affirms the trial court on this assignment.

■ Under its last assignment, appellant submits that the trial court erred in concluding that it was obligated to pay appellee's costs and attorney fees in bringing the instant declaratory judgment action. Appellant argues that in the absence of any indication that it acted in bad faith in not immediately representing appellee in the underlying action, appellee was not entitled to recover the costs of the instant action. In support, appellant emphasizes that due to the state of the law as to the pollution exclusion, it had a legitimate belief that it was not obligated to defend or indemnify appellee.

As to this point, this court would note that although the trial court held that appellee was entitled to recover the costs of the declaratory judgment action, it delayed its determination of the amount of damages which appellee had actually incurred. Since the trial court has not determined all of the issues raised under appellee's third claim, it is not properly before this court in this appeal. See *R & H Trucking, Inc. v. Occidental Fire & Cas. Co. of North Carolina* (1981), 2 Ohio App.3d 269, 2 OBR 298, 441 N.E.2d 816. In relation to this point, we would also note that the trial court's finding of "no just cause" was only made as to appellee's first claim. As the remainder of the court's judgment cannot be reviewed at this time, appellant's sixth assignment is without merit.

Accordingly, pursuant to the discussion under the third assignment, the judgment of the trial court is reversed and judgment is entered for appellant, to the extent that appellant is obligated to defend appellee only on the November 1980 release. Pursuant to our discussion of the first assignment, the judgment of the trial court is reversed and the case is remanded for further proceedings on the issue of whether appellant was prejudiced by the delay in notice of the claim.

*Judgment accordingly.*

FORD, P.J., and JOSEPH E. MAHONEY, J., concur.