EMPLOYERS INSURANCE OF WAUSAU et al., Appellees,

v.

AMCAST INDUSTRIAL CORPORATION et al., Appellants.

[Cite as *Emp. Ins. of Wausau v. Amcast Indus. Corp.* (1998), 126 Ohio App.3d 124.]

Court of Appeals of Ohio,
Second District, Montgomery County.

Nos. 16444 and 16677.

Decided April 17, 1998.

*John W. Slagle* and *Michelle K. Enright*, for appellee Nationwide.

*Ann Wightman, D. Jeffrey Ireland* and *Thomas R. Kraemer*, for appellant Amcast Industrial Corp.

*James W. Barnhouse* and *Elizabeth T. Jozefowicz*, for appellee Pacific Employers Insurance Co.

*Jerry S. Sallee, Gregory A. Harrison* and *Alan H. Abes*, for appellees United States Fire Insurance Co. and International Insurance Co.

*Ronald B. Lee* and *Laura M. Faust; Walter J. Andrews* and *Lon A. Berk*, for appellee United States Fidelity & Guaranty Co.

*Stephen Sonderby* and *Peter Bora; Stephen V. Freeze*, for appellee Continental Casualty Co.

FAIN, Judge.

Defendant-appellant Amcast Industrial Corp. appeals from a summary judgment rendered against it. Amcast argues that a pollution-exclusion exception contained in the insurers' policies that includes sudden and accidental releases of contaminants does not exclude coverage where foundry sand deposited by Amcast in a disposal site released contaminants after being mixed with tar-plant waste deposited by another company. Amcast also argues that several insurers have a duty to defend it from contribution claims arising from the cost of cleaning up the disposal site.

We conclude that Amcast's disposal of foundry sand as part of its normal and routine operations, rather than the release of contaminants from the foundry sand when it is mixed with tar-plant waste, is the polluting activity that is subject to the pollution-exclusion exception contained in the insurers' policies and that this polluting activity was not sudden and accidental and does not warrant indemnification by the insurers. Further, we conclude that the contribution

claims of a third party are not potentially or arguably within the insurers' policy coverage. Accordingly, the judgment of the trial court is affirmed.

I

From 1916 to 1984, defendant-appellant Amcast Industrial Corp. operated a foundry in Ironton, Ohio. During the course of ownership, Amcast purchased one or more primary or excess commercial risk insurance policies from appellees Continental Casualty Co., Employers Insurance of Wausau, Employers Reinsurance Corp., Fire State Insurance Co., Hartford Accident and Indemnity Co., Highlands Insurance Co., Integrity Insurance Co., International Insurance Co., Mission Insurance Co., National Union Fire Insurance Co. of Pittsburgh, PA, Nationwide Mutual Insurance Co., Pacific Employers Insurance Co., United States Fidelity and Guaranty Co., United States Fire Insurance Co., and Western Employers Insurance Co.

From 1945 to 1977, Allied–Signal, Inc. used the Goldcamp Disposal Area, a former sand and gravel pit located in Ironton, as a disposal site for the hazardous wastes from its tar plant. Amcast also used the Goldcamp Disposal Area for the disposal of spent sand from its foundry operation. In 1989, the United States Environmental Protection Agency issued an administrative order directing Allied–Signal and Amcast to clean-up the Goldcamp Disposal Area. The cost of cleaning up the site was estimated at $20 million. Amcast chose not to assist in cleaning up the site, and Allied–Signal sued Amcast for contribution in the United States District Court, Southern District of Ohio, Western Division, at Dayton (case No. C–3–92–013), alleging that hazardous substances had been released from the foundry sand that Amcast deposited at the Goldcamp Disposal Area.

Amcast met with its insurers in September 1992, to seek coverage for its potential losses in several contaminated sites in Wisconsin. Soon after, Amcast filed a lawsuit in Wisconsin against its insurers. Rather than indemnify Amcast for potential losses arising from the Goldcamp Disposal Area, plaintiffs-appellees Employers Insurance of Wausau and Nationwide Mutual Insurance Co. initiated a declaratory judgment action in the Court of Common Pleas, Montgomery County, Ohio (case No. 92–4517) (hereafter referred to as the "Wausau" action), naming Amcast and the remaining commercial risk insurers as defendants. The following day, another of Amcast's insurers, Affiliated FM, filed a similar complaint for declaratory judgment in the same court (case No. 92–4530) (hereafter referred to as the "Affiliated FM" action). The insurers in both actions moved for summary judgment, claiming that their policies either did not cover any losses from pollution or only covered losses resulting from "sudden and accidental" releases of hazardous substances and that the contamination of the Goldcamp Disposal Area was not the result of a sudden or accidental release.

The trial court in the Affiliated FM action granted the plaintiff's motion for partial summary judgment on March 3, 1993 and then consolidated the lawsuit with the Wausau action. Thereafter, the trial court in the consolidated action granted the insurers' various motions for summary judgment and ruled that the pollution exclusion that excepted all but "sudden and accidental" releases applied to Amcast's potential losses arising from the Goldcamp Disposal Area, thereby precluding coverage.

From the judgment of the trial court, Amcast appeals.

## II

Amcast's first and second assignments of error are as follows:

"The trial court erred in granting summary judgment on the issue of whether appellee insurers have a duty to indemnify appellant Amcast Industrial Corporation because there are genuine issues of material fact as to whether releases of hazardous substances occurred suddenly.

"The trial court erred in granting summary judgment on the issue of whether appellee insurers have a duty to indemnify Amcast because the policies cover a series of sudden releases and, even if a series of releases is not covered, there are genuine issues of material facts as to whether a series of releases occurred."

In its first assignment of error, Amcast contends that the affidavit of its expert, John Mundell, as attached to its October 29, 1993 memorandum in opposition to motions for partial summary judgment, precluded summary judgment by creating a genuine issue of material fact as to whether the release of contaminants from the foundry sand deposited at the Goldcamp Disposal Area was sudden and accidental.[1] Amcast argues that the trial court improperly weighed the evidence and resolved the affiant's credibility in favor of the moving party when it concluded that the release of contaminants from the foundry sand had occurred over an extended period of time. In addition, Amcast argues that the movants failed to satisfy their burden of proof in showing that the release of contaminants from the foundry sand did not occur suddenly and accidentally. Further, Amcast suggests that the trial court, in construing the language of the insurance policy,

---

1. Initially, we note that the Mundell affidavit was filed after the trial court in the Wausau and Affiliated FM actions had granted certain insurers' motions for partial summary judgment. However, we also note that the Mundell affidavit was filed in support of Amcast's motion for relief from judgment based on newly discovered evidence as well as in support of its memorandum in opposition to the motions for partial summary judgment filed by the remaining insurers. The trial court found that the Mundell affidavit constituted newly discovered evidence. We will not disturb the trial court's finding; we will consider the Mundell affidavit with respect to all of the motions for partial summary judgment filed in the Wausau and Affiliated FM actions.

improperly focused on the migration of contaminants into the groundwater rather than on the release of contaminants from the foundry sand into the soil.

In its second assignment of error, Amcast maintains that the contaminants in the foundry sand escaped into the soil as a result of numerous separate, independent releases, each of which was a sudden and accidental release covered by the insurers' policies. Alternatively, Amcast contends that the movants failed to prove that a series of releases occurred over time that were not sudden and accidental.

The insurance policies at issue in this case, while differing in their coverage, all contain an environmental exclusion providing as follows:

"[T]he insurance does not apply to * * * property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquid or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*" (Emphasis added.)

The complaint filed by Allied–Signal alleged that Dayton Malleable Iron Company and Dayton Malleable, Inc., predecessors in interest to Amcast, disposed of foundry sand, which contained phenols, a hazardous substance, at the Goldcamp Disposal Area. A remedial investigation performed by Allied–Signal pursuant to an administrative order entered into with the United States Environmental Protection Agency and the Ohio Environmental Protection Agency revealed that the Goldcamp Disposal Area contained hazardous substances, including phenol, and that the groundwater at or near the site was also contaminated. Allied–Signal sought contribution from Amcast for the cost of cleaning up the Goldcamp Disposal Area.

In response to certain insurers' motions for partial summary judgment and in support of its own motion for relief from judgment, Amcast proffered the affidavit of John A. Mundell, an environmental engineer and consultant. Pertinent portions of the Mundell affidavit state as follows:

"9. [T]he GDA [Goldcamp Disposal Area] was used for disposal of tar plant process chemical wastes during the period from 1945 to 1977 * * *. DMI's foundry wastes were mixed with Allied–Signal's tar plant wastes at the GDA by Allied–Signal.

"* * *

"11. The clean-up at the GDA is being driven by the presence of high concentrations of polynuclear aromatic hydrocarbons ('PAHs') in the groundwater system beneath it. Although minute levels of PAHs sometimes may be found in foundry wastes, PAHs are not typically leached into the groundwater at foundry

waste sites at regulatory levels of concern. In addition, laboratory leaching studies of foundry wastes have shown that only very low levels of PAHs are capable of being released under even the most severe leaching environments.

"12. I am familiar with the opinions of Allied–Signal's expert witness, Dr. Joseph Bern. It is Dr. Bern's opinion that PAHs in DMI's foundry wastes were mobilized from the sand when the sand was mixed by Allied–Signal with tar plant wastes containing solvents such as benzene, toluene, xylene and ethyl benzene. * * * I concur with Dr. Bern's opinion.

"13. Dr. Bern has further opined that Allied–Signal's physical mixing with a bulldozer of the Allied–Signal tar plant wastes with DMI's foundry wastes by Allied–Signal caused the liquid and semi-solid tar plant wastes to react with the dry PAH coatings on the foundry wastes and caused the PAHs to become more mobile than they would be under normal conditions. * * * I concur with Dr. Bern's opinion. It follows then that but for Allied–Signal's waste, and its handling of the two waste streams, there would have been no significant release of PAHs from the DMI wastes (i.e., a release above regulatory levels of concern).

"14. The liquid and semi-solid organic tar plant wastes deposited in the GDA by Allied–Signal are generally described as Dense Nonaqueous Phase Liquids ('DNAPLs') and, as such, have a density greater than water. As a result, once these wastes were dumped into the GDA and mixed with DMI's foundry wastes, the wastes from the tar plant move downward in liquid form as DNAPLs, into the underlying aquifer below the GDA. As the DNAPLs moved downward, they carried any PAHs that were removed from the DMI wastes with them.

"15. Foundry wastes are solids and have not been found to contain DNAPLs or to produce DNAPLs once they are disposed of in a landfill setting. PAH levels that are capable of being leached or dissolved from foundry wastes are very low even in the most severe of environmental settings. For these reasons, any releases of PAHs into the underlying groundwater system beneath the GDA at levels above those of regulatory levels of concern would be classified as 'unexpected' and 'unintended' based on the physical and chemical nature of the foundry wastes.

"16. If releases of PAHs from the foundry wastes above regulatory levels of concern have occurred and, as such require remediation costs to be incurred as a result, these releases occurred concurrently with the rapid vertical movement of each discharge of the tar plant wastes into the underlying aquifer and *therefore constitute sudden and accidental releases, i.e., releases that occurred quickly, abruptly and without prior notice.* The releases did not take place gradually as that term is used in the insurance context." (Emphasis added.)

In deciding the insurers' motion for partial summary judgment and Amcast's motion for relief from judgment, the trial court addressed the merits of the Mundell affidavit. After reviewing the pertinent portions of the Mundell affidavit, the trial court concluded that, under the "sudden and accidental" standard promulgated by the court in *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St.3d 657, 597 N.E.2d 1096, the migration of PAHs into the soil does not meet the temporal requirement. Furthermore, the trial court noted that even if each individual release of PAHs was sudden and accidental, the contamination of the Goldcamp Disposal Area was the result of multiple releases occurring over a period of years, which, collectively, could not be considered sudden and accidental. In sum, the trial court found that there was no genuine issue of material fact and that the polluting events forming the basis for Allied–Signal's claims against Amcast were not sudden and accidental and, therefore, were not within the scope of the insurance coverage.

In *Hybud Equip. Corp., supra,* 64 Ohio St.3d at 665, 597 N.E.2d at 1101–1102, the Ohio Supreme Court, in construing an insurance pollution exclusion identical to the provision in this case, held that the word "sudden" has a temporal meaning that is not synonymous with the word "unexpected." The court noted that the common meaning of the word "sudden" is to happen quickly, abruptly, or without prior notice, while the meaning of the word "accidental" is to be unexpected, as well as unintended. *Id.* at 666, 597 N.E.2d at 1102–1103. Based on these definitions, the court concluded that "[t]he inclusion of the word 'sudden' readily indicates that the exception was not intended to apply to a release that occurred over an extended time." *Id.* at 667, 597 N.E.2d at 1103. The court went on to observe that the intent behind the "sudden and accidental" pollution exception was to limit coverage to those events in which damages are caused by abrupt incidents such as equipment malfunctions and explosions. *Id.,* quoting *Claussen v. Aetna Cas. & Sur. Co.* (S.D.Ga.1987), 676 F.Supp. 1571, 1580.

Amcast responds to the standard set forth in *Hybud Equip. Corp.* by citing *Sanborn Plastics Corp. v. St. Paul Fire & Marine Ins. Co.* (1993), 84 Ohio App.3d 302, 312, 616 N.E.2d 988, 995, in which the court of appeals found that a release of pollutants occurring on one specific day, which was not part of a series of releases occurring over four years, potentially could have been a "sudden" release covered under the insurance policies. Using this rationale, Amcast suggests that the Mundell affidavit establishes that the releases of PAHs from the foundry sand were in fact multiple independent releases, each being sudden and accidental, which occurred when the foundry sand was mixed with the tar-plant wastes deposited by Allied–Signal. Thus, Amcast concludes that the Mundell affidavit establishes genuine issues of material fact as to the nature of the releases of

contaminants at the Goldcamp Disposal Area, precluding summary judgment on the issue of whether or not the releases are covered under the insurance policies.

■■ Upon consideration of Amcast's argument, we are struck by the underlying premise that the polluting activity for which Amcast seeks coverage is the release of PAH's from the foundry sand, which the Mundell affidavit describes as being sudden and accidental. In order to accept this premise, we would also have to accept the fiction that Amcast "stored" PAH's in the otherwise innocuous foundry sand. Instead, we are persuaded by the argument advanced by the insurers that Amcast's release of the foundry sand into the Goldcamp Disposal Area was the polluting activity contemplated by the insurance policies—not the chemical release of PAH's from the foundry sand as a result of the mixing of tar-plant waste. Amcast did not "store" PAH's in the foundry sand any more than other manufacturers "store" contaminants in scrap metal debris, ash piles, or slag heaps. Amcast released foundry sand, a waste material, into the environment as part of its normal and routine manufacturing operations. At the time, Amcast may have had cause to believe that foundry sand was not a harmful contaminant and posed no threat to the environment. Nevertheless, when the foundry sand was mixed with the tar wastes deposited by Allied–Signal, it released contaminants into the soil and groundwater. While the contamination of the environment was unintended, the release of foundry sand was not. Accordingly, we cannot construe Amcast's practice of depositing foundry sand at the Goldcamp Disposal Area as sudden and accidental.

■ This conclusion is consistent with the Supreme Court of Ohio's interpretation of the pollution exclusion in *Hybud Equip. Corp.* Amcast's practice of disposing of foundry sand in the Goldcamp Disposal Area is a far cry from the abrupt incidents described by the court, like, for example, equipment malfunctions and explosions. See 64 Ohio St.3d at 667, 597 N.E.2d at 1103. Furthermore, the pollution exclusion expressly states that the insurance does not apply to property damage arising from the release of "waste materials" upon the land unless the release is sudden and accidental. Foundry sand is a waste material, and the release of that material upon the land, which occurred as part of normal and routine operations, allegedly caused property damage. Accordingly, the unambiguous terms of the insurance policies preclude coverage for losses arising from the allegations in Allied–Signal's complaint.

With respect to the trial court's judgment, we find that the uncontroverted evidence in the record, including the Mundell affidavit, establishes that there is no genuine issue of material fact and that the polluting activity alleged by Allied–Signal falls within the pollution exclusion contained in the appellees' insurance policies. Because we conclude that the polluting activity alleged by Allied–Signal

was neither sudden nor accidental, we need not address Amcast's remaining arguments regarding coverage for multiple independent releases.

Amcast's first and second assignments of error are overruled.

## III

Amcast's third assignment of error is as follows:

"The trial court erred in granting summary judgment on the issue of whether certain of the appellee insurers have a duty to defend Amcast because claims made against Amcast are potentially within the scope of coverage and, thus, the claims triggered the insurers' duties to defend Amcast."

Amcast argues that although the insurers may not be required to indemnify it for losses arising from Allied–Signal's claims, the allegations made by Allied–Signal are potentially within the scope of the insurance policies, and, therefore, several[2] insurers must accept the defense of the claims. Amcast suggests that the evidence in the record raises the possibility that the polluting activity alleged by Allied–Signal was sudden and accidental and therefore within the scope of coverage.

In *Willoughby Hills v. Cincinnati Ins. Co.* (1984), 9 Ohio St.3d 177, 180, 9 OBR 463, 465, 459 N.E.2d 555, 558, the Supreme Court of Ohio held that "where the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage had been pleaded, the insurer must accept the defense of the claim." The court proceeded to note that "the 'scope of the allegations' may encompass matters well outside the four corners of the pleadings."

We agree with Amcast's assertion that an insurer's duty to defend may be broader than its duty to indemnify the insured. After reviewing the allegations set forth in Allied–Signal's complaint, however, we find that the claims for which Amcast seeks coverage are not potentially or arguably within the scope of the insurance policies for the reasons discussed in connection with Amcast's first and second assignments of error. Amcast's disposal of foundry sand at the Goldcamp Disposal Area was not potentially or arguably sudden and accidental, and property damage arising from that disposal is not covered by the insurers'

---

2. Amcast alleges that appellees Nationwide Mutual Insurance Co., First State Insurance Co., Highlands Insurance Co., National Union Fire Insurance Co. of Pittsburgh, PA, United States Fidelity & Guaranty Co., and United States Fire Co. have a duty to defend it from Allied–Signal's claims.

policies. Accordingly, we conclude that the insurers have no duty to defend Amcast from the claims asserted by Allied–Signal.

Amcast's third assignment of error is overruled.

## IV

Amcast's assignments of error having been overruled, the judgment of the trial court is affirmed.

*Judgment affirmed.*

FREDERICK N. YOUNG, P.J., and GRADY, J., concur.