ORMET PRIMARY ALUMINUM CORPORATION, APPELLANT, *v.* EMPLOYERS INSURANCE OF WAUSAU ET AL., APPELLEES.

[Cite as *Ormet Primary Aluminum Corp. v. Employers Ins. of Wausau* (2000), 88 Ohio St.3d 292.]

(No. 98–2456—Submitted October 20, 1999—Decided April 5, 2000.)

294

298

Neal R. Brendel and Paul K. Stockman, pro hac vice; and Yoss & Hampton and Richard M. Yoss, for appellant.

Hugh C. Griffin, Alfred L. Buchanan and Stephen M. Murray, pro hac vice; Arter & Hadden and Irene C. Keyse–Walker; Roetzel & Andress and Bradley L. Snyder; and Law Offices of James W. Peters and James W. Peters, for appellees Certain Underwriters at Lloyd's of London.

Gallagher, Sharp, Fulton & Norman, Robert H. Eddy, Alton L. Stephens and Alexander E. Goetsch; and Hanlon, Duff, Paleudis & Estadt Co., L.P.A., and Gerald P. Duff, for appellee Globe Indemnity Company.

Burech & Crow and Stanley G. Burech; David C. Linder and Roger B. Frederickson, pro hac vice; and Reminger & Reminger Co., L.P.A., and Clifford C. Masch, for appellee Employers Insurance of Wausau, A Mutual Company.

Gottlieb, Johnston, Beam & Dal Ponte and Jeffrey Robert Beam; and David J. Bloss, pro hac vice, for appellee Home Indemnity Company.

Crabbe, Brown, Jones, Potts & Schmidt, Larry H. James and Amy Fulmer Stevenson, urging affirmance for amicus curiae, Ohio Association of Civil Trial Attorneys.

Keener, Doucher, Curley & Patterson, Thomas Joseph Keener and Amy K. Schermer, urging affirmance for amicus curiae, Insurance Environmental Litigation Association.

Jones, Day, Reavis & Pogue and Brian F. Toohey, urging reversal for amici curiae, Cleveland Cliffs, Inc. and Lincoln Electric Company.

Paul A. Rose, Keven Drummond Eiber and Brouse McDowell, urging reversal for amici curiae, Ohio Chemical Council, Inc., BP Amoco Corp., PPG Industries, Inc., RPM, Inc., B.F. Goodrich Company, and Goodyear Tire and Rubber Company.

---

LUNDBERG STRATTON, J. Today we are asked to decide whether the court of appeals erred in affirming the trial court's granting of the appellees' joint motion for summary judgement due to Ormet's unreasonably late notice to its insurance carriers. We find no error and therefore we affirm the judgment of the court of appeals.

Pursuant to Civ.R. 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Further, "summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor." Civ.R. 56(C).

The principal purpose of Civ.R. 56(E) is to enable movement beyond allegations in pleadings and to analyze the evidence so as to ascertain whether an actual need for a trial exists. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47. Because it is a procedural device to terminate litigation, summary judgment must be awarded with caution. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 604 N.E.2d 138.

While the question of whether the insured met the notice condition is usually a question for the jury, an unexcused significant delay may be unreasonable as a matter of law. In order to determine whether the trial court's granting of summary judgment was proper, the first question we must decide is whether Ormet provided timely notice of its claims. The trial court found that no question of fact existed on this issue and that the notice of claims provided to the insurers was late as a matter of law.

The applicable language of the primary insurers' policies (Wausau's and Globe's) is:

"When an accident [occurrence] occurs written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. * * *"

These policies also require immediate notice to the insurer if a claim is made or suit is brought against the insured. Further, Globe's policies contain an added endorsement: "It is agreed that the words 'as soon as practicable' contained in conditions ten and eleven of the policy [conditions requiring notice of accident or suit] shall mean after an accident or suit becomes known to the Insurance Department of the Insured at P.O. Box 176, Hannibal, Ohio."

Globe's policies define "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." In addition, Wausau's policies define "occurrence" as "an accident or a continuous or repeated exposure to conditions resulting in injury during the policy period, except exposure to a condition created, induced or allowed to exist

by the insured after it is evident that bodily injury, sickness, disease or death may result from continued exposure to such condition."

The excess policies (Lloyd's and Home's) contain notice provisions that require notice when it appeared that the loss was likely to exhaust the primary insurance coverage: "Whenever the Insured [Assured] has information from which the Insured [Assured] may reasonably conclude that an occurrence covered hereunder involves injuries or damages which, in the event that the Insured [Assured] should be held liable, is likely to involve this Policy, notice shall be sent to [the Company] as soon as practicable[;] provided, however, that failure to notify the above firm of any occurrence which at the time of its happening did not appear to involve this Policy, but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims."

A provision in the Home policies defines "occurrence" as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence."

We turn to the undisputed facts concerning notice in order to determine whether Ormet complied with the notice provisions in its insurance policies. By 1966, Ormet knew that the water drawn from its Ranney Well was contaminated with twenty-four ppm of fluorides, an amount as much as twelve times the drinking water standard of the time. By 1971, when Ormet's Water Problems Committee's first report noted a "cyanide problem," Ormet knew that the Ranney Well contained ten ppm cyanide, a level between fifty and two hundred times the 1971 drinking water and river discharge water standards. Shortly before the NPDES permit was issued in 1975, engineering department memoranda again indicates Ormet's knowledge of its cyanide problem and its knowledge that the Ohio EPA was unaware of the problem.

By 1976, an internal memorandum from Ormet Chief Chemist Baretincic to then Director of Corporate Engineering Bolo acknowledges that building a groundwater treatment plant to remedy the contamination problem would probably be in excess of $3,000,000. By July 1977, Ormet's groundwater consultant, Dames & Moore, notified Ormet of cyanide levels and fluoride concentrations in the groundwater that were as much as 500 times the national limits. By 1981, a report was provided to the Ohio EPA, as provided by relevant regulations, that revealed that Ormet was discharging high concentrations of complex cyanides into the river.

By 1983, Ormet believed that the Ohio EPA would probably require a geological survey to determine the cause of the aquifer contamination and a

course of action to clean it up. By 1985, the USEPA nominated the Hannibal Site for inclusion on the USEPA's National Priorities List, otherwise known as the Superfund.

By April 1986, Ormet was aware that the USEPA had found Ormet to be a potentially responsible party for the contamination with possible liability for all costs associated with removal or remedial action and all other necessary costs incurred in cleaning up the Site. By 1987, Ormet was formally placed on the NPL, and Ormet signed a thirty-eight-page settlement agreement, Administrative Order by Consent, with the USEPA and the Ohio EPA. By 1988, Ormet acknowledged that the cost of the solution to the contamination was between $3,000,000 and $8,000,000.

By 1989, Ormet had discussed the contamination problem with its insurance broker and knew that it should notify all insurers that a potential problem might exist at the Site. By 1991, Ormet had already spent $2 million for governmental oversight costs and contemplated that the price range for constructing the interceptor well-water treatment plant would be $2.5 to $3 million.

Ormet sent its first notice of potential claims to its insurers in March 1992. The trial court and the court of appeals held that Ormet knew in 1976 that it was liable for its contamination and that the liability was likely to exceed $1,000,000. The trial court and the appellate court concluded that Ormet's notice to both its primary and excess insurers was unreasonable, as a matter of law. We agree.

Ormet appears to argue that while it was aware of the environmental contamination, it was not aware until much later that any governmental regulatory action would be taken against it. However, this clearly relates to notice of claim, not notice of occurrence. Moreover, as for the claim that Ormet did not see the need to notify its insurers until after the CERCLA legislation was passed, even before CERCLA, water pollution laws always existed in Ohio. See R.C. 6111.01 *et seq.*

In addition, Ormet appears to argue that a genuine issue of material fact exists with respect to the Globe primary policy requiring notice as soon as practicable after an accident or suit becomes known to Ormet's Insurance Department, and with respect to the excess policies. Yet, the record contains a memo dated March 1, 1989 from Ormet's insurance administrator to Vice–President Bolo acknowledging that he was aware of "the problem" at the Hannibal Site and had discussed it with Ormet's insurance broker. This occurred more than three years before Ormet sent its first notice of "potential claims" to its insurers.

Notice provisions in insurance contracts serve many purposes. Notice provisions allow the insurer to become aware of occurrences early enough that it can have a meaningful opportunity to investigate. *Ruby v. Midwestern Indemn. Co.* (1988), 40 Ohio St.3d 159, 161, 532 N.E.2d 730, 732. In addition, it provides the insurer the ability to determine whether the allegations state a claim that is

covered by the policy. See *In re Texas E. Transm. Corp. PCB Contamination Ins. Coverage Litigation* (E.D. Pa. 1992), 870 F.Supp. 1293. It allows the insurer to step in and control the potential litigation, protect its own interests, maintain the proper reserves in its accounts, and pursue possible subrogation claims. See *Am. Ins. Co. v. Fairchild Industries, Inc.* (E.D.N.Y.1994), 852 F.Supp. 1173, 1179. Further, it allows insurers to make timely investigations of occurrences in order to evaluate claims and to defend against fraudulent, invalid, or excessive claims.

A provision in an insurance contract requiring "immediate" notice means that the notice must take place "within a reasonable time under the circumstances of the case." *Travelers' Ins. Co. v. Myers* (1900), 62 Ohio St. 529, 57 N.E. 458, paragraph four of the syllabus, overruled in part by *Employers' Liab. Assur. Corp. v. Roehm* (1919), 99 Ohio St. 343, 124 N.E. 223; *Heller v. Std. Acc. Ins. Co.* (1928), 118 Ohio St. 237, 160 N.E. 707. Similarly, we have held that "[a] provision in an insurance policy requiring 'prompt' notice to the insurer requires notice within a reasonable time in light of all of the surrounding facts and circumstances." *Ruby* at the syllabus. Thus, a notice provision requiring notice to the insurer "as soon as practicable" requires notice within a reasonable time in light of the surrounding facts and circumstances.

The courts below went on to consider whether or not Ormet's untimely notice to its insurers resulted in prejudice to the insurers because the courts below held that untimely notice relieves an insurer of its obligation to provide coverage if the insurer can show prejudice as a result of the delay. The courts below concluded that unreasonable delay in the giving of notice may be presumed prejudicial to the insurer absent evidence to the contrary. In this case, we are not required to determine whether Ormet presented proof to rebut the presumption of prejudice because reasonable minds could only conclude that the appellees suffered actual prejudice from the delay.

The first example of actual prejudice to the insurers is the list of witnesses who have died since the events giving rise to this litigation occurred. The following potential witnesses are now deceased:

T.A. Hermeling was Ormet's "primary contact" with the Ohio EPA concerning the consent order for the RI/FS. He was the Ormet employee who was principally responsible for responding to inquiries from the Ohio EPA. He kept all environmental records and reports.

Fred Klaer was retained by Ormet in the early 1970s as a consulting hydrogeologist responsible for investigating the groundwater contamination at the Site. Klaer drafted at least four reports during his time as a consultant to Ormet and recommended in 1972 that Ormet install the interceptor wells.

Tibor Gyoerkoes, the Chief Chemist at Ormet, collected the laboratory information that was reported to the Ohio EPA. He directed the water testing at the Site in the early 1970s, and in the early 1980s was responsible for Ormet's laboratories. He was also a member of the Water Problems Committee.

Art Carter signed Ormet's October 1971 water discharge report, a report that makes no reference to cyanide but was submitted while Ormet's management was having internal discussions about the company's cyanide problem. He decided what information would be given to the state and was also a part-time member of the Water Problems Committee.

Harry Zimmerman was the head of Ormet's Insurance Department from the early 1960s through the late 1970s and was responsible for purchasing most of the insurance policies at issue. Don Wilson was the primary attorney for Eckert, Seamans working on Ormet's environmental matters during this time. He was also Ormet's spokesperson. In addition, the F.H. McGraw Company, which designed the Hannibal Site, has gone out of business, and Ormet's primary contact at McGraw, Harry Brandeth, is deceased.

Moreover, there are four or five witnesses who allegedly would have knowledge of Ormet's potliner disposal piles and the contents of its scrap dump, both of which are alleged sources of the current contamination at the Site. All of the above potential witnesses are deceased, clearly working actual prejudice to the insurers by depriving them of the opportunity to question the witnesses.

In addition to witnesses who have passed on, memories fade. For example, there are four remaining members of the originally seven-member Water Problems Committee. By their own admission, and as a natural occurrence over twenty years, most agreed that their memories have faded. In addition, remaining Ormet employees do not recall the substance of the internal discussions regarding the recommendations in the Dames & Moore groundwater report.

Other prejudice may result from documents or other evidence being lost or destroyed. In addition, certainly, the physical conditions of the Site have changed significantly over the past twenty years. In addition to opportunities for fraud, options available to the insurance companies rapidly diminish as time passes, leaving them to deal with decisions made by the insured that may not be in either the insured's or the insurer's best interest. The most glaring example of this type of prejudice is that Ormet unilaterally entered into a thirty-eight-page settlement agreement, in the form of an Administrative Order by Consent, with the USEPA and the Ohio EPA without notifying or obtaining the consent of its insurers. Ormet agreed in the AOC to conduct an RI/FS for the Site and to reimburse the governmental agencies' costs, now alleged to be over $1.7 million, in overseeing the RI/FS project.

Ormet argues that it handled the environmental contamination remediation in the most efficient and cost-effective manner possible, and, therefore, the insurers were not prejudiced by the delay in giving notice. Ormet points to the deposition testimony of Marcia Williams of the USEPA, who stated that she carefully investigated and discussed the remedial actions taken at the Site, comparing them with remedies selected for other Superfund sites, and concluded that (1) the costs Ormet incurred prior to 1992 were integral and unavoidable, and (2) the remedies selected for the site are reasonable, and are less stringent and less costly than those implemented at other sites.

We conclude that this is speculative at best. Further, we find Ormet's allegation that notifying the insurers in a timely manner would have resulted only in a prior denial of insurance coverage is purely conjecture. As such, these unsupported claims about what the insurers would have done if earlier notice had been given are immaterial.

We hold that reasonable minds could not differ that Ormet failed to give timely notice to its insurers causing the insurers to suffer actual prejudice. Accordingly, the appellees were entitled to summary judgment as a matter of law. We affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY and COOK, JJ., concur.

PFEIFER, J., dissents.

———————

**PFEIFER, J., dissenting.** This is a case where conditions, potential liability, and the law were evolving and unfolding over time. There was no real "event" to measure timeliness. This case demands a jury's determination as to whether notice was timely.

I would hold that the issue of prejudice to the insurers should also have been submitted to a jury. I believe reasonable minds could differ as to whether the insurers were prejudiced. Ormet's argument that its settlement with the US-EPA and the Ohio EPA was as good as could be expected has some appeal. Also, Ormet's argument that denial of coverage was a foregone conclusion, making the timing of notice irrelevant, could also persuade a reasonable juror that the insurers were not prejudiced.