DECISION AND JOURNAL ENTRY
The decision previously filed in this case, Aetna Casualty SuretyCo. v. Goodyear Tire Rubber Co. (Sept. 20, 2000), Summit App. No. 19121, unreported, is hereby vacated and replaced with this decision and journal entry.
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant, Goodyear Tire Rubber Company ("Goodyear"), appeals from a judgment of the Summit County Court of Common Pleas on some of its claims for declaratory judgment against several insurance carriers from which it sought defense and indemnity coverage. Summary judgment was granted to several defendants; others were granted directed verdicts. This Court affirms in part and reverses in part.
On September 29, 1993, Goodyear brought this action against more than fifty insurance companies based on comprehensive general liability ("CGL") insurance policies it held from 1949 through the middle of 1985. Goodyear sought, among other things, a declaration that these defendants had the duty to defend and/or indemnify it against environmental clean-up actions brought under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). The CERCLA actions stemmed from environmental contamination caused by the waste disposal practices of Goodyear and some of its subsidiaries at numerous disposal sites around the country.
During the next several years, lengthy discovery ensued and numerous pretrial motions were filed and ruled upon, one of which was affirmed on appeal to this Court in Goodyear Tire Rubber Co. v. Aetna Casualty andSurety Co. (July 12, 1995), Summit App. No. 16993, unreported. Numerous claims, defendants, and specific insurance policies were disposed of through pretrial motions. Although Goodyear sought defense and indemnity coverage for its liability at several disposal sites, the parties agreed to limit the evidence at the first trial to two of the disposal sites: the Army Creek Landfill in New Castle, Delaware and the Motor Wheel disposal site (also known as the Lake Lansing Road disposal site) in Lansing, Michigan. Goodyear's liability at each of these sites stemmed from the disposal practices of Motor Wheel Corporation, a former subsidiary of Goodyear.
 Motor Wheel Corporation
Goodyear purchased Motor Wheel Corporation of Michigan ("Motor Wheel") in January 1964, and continued to operate the business until 1981 as a newly formed Ohio corporation. Motor Wheel manufactured automotive wheels, tailpipes, tubing, and brake parts at one plant in Newark, Delaware and at three plants in Lansing, Michigan.
 Motor Wheel Disposal Site
The Motor Wheel disposal site was located less than a mile from one of Motor Wheel's plants in Lansing, Michigan. Motor Wheel purchased the site in 1938 and disposed of plant wastes there until the late 1970s. Materials were hauled to the site in trucks and dumped onto the ground or into ponds. Among the wastes disposed there during the 1940s, and maybe longer,[1] was a vapor degreaser solvent, trichlorethylene ("TCE"), that Motor Wheel used to clean grease and oil from machine parts. It was commonly believed at that time that the TCE would evaporate. It was discovered years later, however, that TCE could degrade into vinyl chloride, a known carcinogen, and that it could seep into the groundwater.
The Motor Wheel site became the target of investigations by the Michigan Department of Natural Resources during the 1970s. Investigations by the United States Environmental Protection Agency ("EPA") began in the early 1980s, shortly after the passage of CERCLA. Motor Wheel admitted to the EPA in 1981 that it had disposed of a variety of wastes at the site. It was eventually determined that approximately twenty companies, including Motor Wheel, had dumped wastes there. The primary polluters, however, were the Motor Wheel plant and a fertilizer plant owned by W.R. Grace Company. Goodyear's liability for the clean up of the site stemmed from its disposal of TCE. On June 26, 1987, Goodyear entered into a negotiated settlement with W.R. Grace Company and the EPA. At the time of trial, Goodyear had spent $11,612,900 for investigation and clean-up costs and the clean up was not yet complete. Goodyear was seeking insurance coverage for these costs, some of which dated back to the late 1970s, as well as for future costs that it would incur to complete the remediation of the Motor Wheel site.
 Army Creek Landfill
During the 1960s, employees of Motor Wheel's Newark, Delaware plant disposed of the general plant trash, including pallets and office and cafeteria trash, in a dumpster outside the plant. Plant employees would also pour phosphate sludge into the same dumpster. Phosphate sludge was the byproduct of Motor Wheel's process of phosphatizing wheel rims, a process it began at the Newark plant in 1964. AmChem, the supplier of Granodine 16, the chemical product used in the phosphatizing process, had assured Motor Wheel employees that the sludge was safe and that they could even use it as fertilizer on their gardens.
The trash in the dumpster was hauled away by a licensed trash hauler, Twardus and Sons. Motor Wheel representatives testified that, at the time, they had no idea at where Twardus and Sons disposed of the trash. They had assumed that the trash went to a landfill, but they did not know the identity or location of the landfill.
Army Creek became a target of CERCLA remedial efforts during the early 1980s. The EPA first contacted Goodyear through a letter dated December 19, 1984, which sought information about Goodyear's release of hazardous substances at either Army Creek or another Delaware landfill. Goodyear could not immediately determine whether Motor Wheel had sent plant trash to Army Creek, as there were no written records to that effect. Eventually, Goodyear was able to determine that the general plant trash from Motor Wheel's Newark plant had been hauled to the Army Creek Landfill until it closed in 1968.
Goodyear was eventually identified as a potentially responsible party for the clean up at Army Creek. Iron contamination of the groundwater was determined to be partially the result of Motor Wheel's disposal of phosphate sludge in the landfill from 1964 until the landfill closed in 1968. Goodyear negotiated a settlement with other potentially responsible parties and the EPA. Goodyear's share of the cleanup costs was 3.2 percent. By early 1994, Goodyear's role in the remediation effort at Army Creek was completed. Goodyear had paid a total of $340,538.12 as its portion of the remediation costs and it was not anticipating further costs stemming from the occurrences at that site.
 The Trial
During May 1998, the case proceeded to trial against almost thirty insurance companies. At issue were well over two hundred CGL insurance policies that Goodyear held over a period of decades: primary insurance policies issued from 1949 until 1977, when Goodyear became self-insured at the primary level; and excess insurance policies issued from 1950 until July 1985, when Goodyear became self-insured at the excess level.
Throughout this period, Goodyear maintained multiple tiers of CGL coverage. The primary policies provided coverage for any qualifying occurrence,[2] up to the coverage limit of $500,000 (raised to $1,000,000 during the second half of 1976). Throughout this period, an "occurrence" was defined to include an injurious exposure to a condition that results, during the policy period, in personal injury or property damage that was not expected or intended by the insured. The excess policies provided coverage for occurrences after the underlying primary coverage limits were exhausted. Goodyear's total CGL coverage gradually increased over time, growing from less than $3,000,000 in 1949 to $200,000,000 in 1986.
During the presentation of Goodyear's evidence, the visiting judge assigned to the case suffered a heart attack and was unable to continue with the trial. Consequently, another visiting judge was assigned to proceed. Goodyear moved for a new trial, alleging that the new judge had missed certain testimony and lacked the requisite familiarity with the case, but the trial court denied the motion. Goodyear presented the remainder of its evidence before the successor judge.
Following the presentation of Goodyear's case, the defendants moved for directed verdicts, asserting numerous grounds for such relief. Without specifying a basis for its decision, the trial court granted directed verdicts to all of the defendants. Because the judgment disposed of only some of Goodyear's claims, the trial court made the requisite finding, under Civ.R. 54(B), that there was "no just reason for delay." Goodyear appeals and raises ten assignments of error that will be rearranged to facilitate discussion.[3]
 I. Directed Verdict
Goodyear's second through ninth assignments of error challenge the directed verdict granted to all defendants who went to trial. Because the defendants asserted eight grounds for directed verdict, and the trial court failed to specify the basis for its decision, Goodyear has challenged all eight grounds through these assigned errors.
Pursuant to Civ.R. 50(A)(4), the trial court should grant a directed verdict if, "after construing the evidence most strongly in favor of the party against whom the motion is directed, [it] finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party[.]" Although the moving party must specify the basis for its directed verdict motion, the trial court has inherent authority to suasponte grant a directed verdict on any ground that is appropriate. Civ.R. 50(A)(3); see Gibbons v. Price (1986), 33 Ohio App.3d 4, 12; Sargeant v.Sampson (Mar. 31, 1999), Summit App. No. 18947, unreported (Carr, J., concurring).
 A. Attachment of Excess Policies
Goodyear's eighth assignment of error focuses on a directed verdict ground that pertains solely to the excess insurers. Several of the excess insurance carriers asserted that Goodyear failed to prove that it was entitled to excess CGL coverage because it did not establish that the attachment points of their policies had been reached. Although this ground was asserted by high-level excess insurance carriers, it was a valid basis for directed verdict for all of the excess insurers.
Each excess policy provided that there would be no liability under the policy until the insured's liability had exceeded the limits of the underlying primary and, if applicable, lower level excess policies. Liability under true excess insurance policies, as are at issue here, does not attach until coverage under the primary policies has been exhausted. 15 Couch, Insurance (3 Ed. 1997), 220-37, Section 220:32. To establish that liability under an excess policy will attach, an insured has the burden of proving that the primary coverage has been exhausted.Sherwin-Williams Co. v. Ins. Co. of Pa. (C.A.6, 1997), 105 F.3d 258,263.
Each of Goodyear's policies, primary and excess, provided coverage only for property damage that occurred during the policy period. Because Goodyear's claims were based on long-term environmental damage, it sought coverage for damages occurring over multiple policy periods. Goodyear's evidence failed to establish a definite point in time when the environmental damage occurred. Instead, Goodyear's experts opined that the damage to the environment began almost as soon as the chemicals were deposited at the disposal sites and continued over the years until the clean-up process was complete.
 Army Creek Landfill
According to Goodyear's evidence, the damage at Army Creek began in 1964 when Motor Wheel began the process of phosphatizing wheel rims at its Newark, Delaware plant and disposing of the byproduct sludge. The property damage was gradual and continuous, as the contamination slowly seeped into the ground and migrated into the groundwater. Thus, Goodyear claimed that it was entitled to coverage under CGL policies issued from 1964 through mid-1985, when Goodyear became self-insured at the excess levels.[4]
Goodyear's total primary CGL coverage for the period 1964 through 1977 was $6,750,000. Goodyear also held self-insurance primary coverage, with annual liability limits of either $1,000,000 or $1,500,000, commencing in 1977. Its total primary coverage for the period 1977 through 1985 was $11,000,000. Thus, for the period 1964 through 1985, Goodyear had a total of $17,750,000 in primary CGL coverage.
Goodyear's evidence demonstrated that its role in the Army Creek cleanup has been completed unless unforeseen problems arise in the future. Goodyear's total share of the clean-up costs was $340,538.12. Although there was evidence to suggest that Goodyear's coverage under its 1973 primary policy had been exhausted, there was no evidence that Goodyear lacked sufficient coverage under its remaining primary policies to cover the full extent of its liability at the Army Creek landfill. Thus, it failed to establish that any of the excess CGL policies would attach.
 Motor Wheel Disposal Site
Contamination at the Motor Wheel site involved a much longer time frame, and consequently many more primary policies, than the Army Creek Landfill. The evidence demonstrated that the TCE contamination at the site that was attributable to Motor Wheel began in the early 1940s. In addition to the $17,750,000 in primary CGL coverage that Goodyear held from 1964 through 1985, it held another $7,500,000 in primary CGL coverage from 1949 through 1963. Thus, from 1949 through 1985, Goodyear had a total of $25,250,000 in primary CGL coverage.
For the sake of argument, however, this Court will exclude certain policies from the calculation because the insurers asserted that these policies did not apply to the damage at the Motor Wheel site: the policies issued before Goodyear acquired Motor Wheel in 1964 (pre-acquisition coverage) and the policies issued after 1970 (pollution exclusion and known loss doctrine).[5] According to Goodyear's evidence, even if the clean-up costs for Army Creek are deducted, it held more than another $14,000,000 in primary CGL coverage for the applicable period.
The evidence demonstrated that Goodyear's costs as of three months before trial had risen to $11,612,990. Although Goodyear's witnesses testified that the clean up was not yet complete, none of its witnesses gave even a rough estimate of the total remediation costs that Goodyear would ultimately be required to pay. Because Goodyear failed to establish that it did not have sufficient primary CGL coverage to pay all of its clean-up costs at the Motor Wheel site, it failed to establish that any of its excess policies would attach.
As to both the Army Creek Landfill and the Motor Wheel Disposal Site, Goodyear failed to establish that its primary coverage would be exhausted and that its excess insurance coverage would attach. Thus, reasonable minds could only conclude that the excess insurance coverage would not attach and the excess insurers were properly granted a directed verdict on this basis. See Civ.R. 50(A)(4).
Because this Court has determined that the excess insurers were properly granted a directed verdict, it will proceed to determine whether there were valid grounds for directed verdict for the primary insurance carriers.
 B. Late Notice
Goodyear's fifth assignment of error is that the insurers were not entitled to a directed verdict on the ground of late notice. Each of the primary insurance policies included a provision that required Goodyear to notify the insurance company of an occurrence "as soon as practicable," "as soon as reasonably possible," or "as soon as possible."[6]
For many years, Ohio has followed the traditional view that proper notice is a condition precedent to insurance coverage. See American Emp.Ins. v. Metro Reg. Transit Auth. (C.A.6, 1993), 12 F.3d 591, 595, citingKornhauser v. National Surety Co. (1926), 114 Ohio St. 24, paragraph three of the syllabus. Policy provisions requiring "prompt notice," "immediate notice," or notice "as soon as practicable" have been interpreted to mean essentially the same thing: notice within a reasonable time given the surrounding circumstances. Ormet PrimaryAluminum Corp. v. Employers Ins. of Wausau (2000), 88 Ohio St.3d 292,303. "While the question of whether the insured met the notice condition is usually a question for the jury, an unexcused significant delay may be unreasonable as a matter of law." Id. at 300. An unreasonable delay in giving notice may be presumed to prejudice the insurer absent evidence to the contrary. Ruby v. Midwestern Indemn. Co. (1988), 40 Ohio St.3d 159,161; Helman v. Hartford Fire Ins. Co. (1995), 105 Ohio App.3d 617, 624.
 Notice to Broker
Initially, this Court must determine whether Goodyear could satisfy its duty to notify its insurers by notifying its insurance broker. Goodyear asserts that it satisfied its duty to notify its insurers when it instructed its insurance broker, Alexander and Alexander ("AA"), to notify a specific insurer or insurers that there had been a potential occurrence at each site. The insurers counter that notice of an occurrence was not effective until AA communicated it to each insurer.[7]
The parties sharply dispute the role of AA in this case. Goodyear asserts that AA acted as the agent of the insurers, while the insurers maintain that AA was simply an insurance broker, an independent middleman between the insured and the insurer. Whether AA served as the insurers' agent is of key importance to determining when Goodyear notified its insurers of the occurrences at each site. As to each site, Goodyear's initial communication to AA was to notify only certain insurers and those were the only insurers that AA notified at that time. During the following months or years, Goodyear added insurers to notification list it communicated to AA. AA did not notify those insurers until it was instructed to do so, months or even years after the insurers it initially notified.
Generally, notice of an occurrence communicated to an insurance agent constitutes notice to the insurer. Helman, supra, at 623. Unlike the insurance agent who represents the insurer, however, a broker typically represents the insured. 7 Holmes, Appleman on Insurance 2d (1998), 326, Section 47.5. Consequently, absent indicia of authority, notice to a broker does not constitute notice to the insurer. Bradford, Inc. v.Travelers Indemnity Co. (Del. 1972), 301 A.2d 519, 524, overruled on other grounds by State Farm Mut. Auto. Ins. Co. v. Johnson (Del. 1974),320 A.2d 345.
AA had placed general liability coverage for Goodyear with numerous different insurers. Consequently, according to the Ohio Supreme Court's holding in Damon's Missouri, Inc. v. Davis (1992), 63 Ohio St.3d 605, syllabus, AA became an agent for each of the insurers. The Ohio Supreme Court's holding in Damon's, however, did not preclude the concept of dual agency. See Bishop v. Ingram-Disney Agency, Inc. (Sept. 6, 1994), Clermont App. No. CA94-02-014, unreported. An insurance representative may serve in a dual capacity as both agent and broker. Holmes, supra, at 327, Section 47.5. "The acts of the person, not what he is called, determine whether he is an agent." American Ins. Co. v. Freeport ColdStorage, Inc. (D.Utah 1987), 703 F. Supp. 1475, 1480. "Whether in a * * * particular matter one acts as an agent for the company or for [the] insured depends upon the intention of the parties, which is to be determined from the facts and circumstances of the case." Meyers v. StateFarm Life Ins. Co. (Mo.App. 1967), 416 S.W.2d 10, 16. Thus, this Court must examine evidence of the relationship between Goodyear and AA regarding how notice of occurrence was handled. See Freeport ColdStorage, supra.
Eldrich Carr, Goodyear's manager of global risk management, testified that Goodyear conducted all of its insurance business through its insurance broker, AA. According to Carr's testimony, the role of AA was simply that of a middleman. Carr gave no indication that AA had authority to act or receive notice on behalf of the insurers. Goodyear sent all premium payments and communications, including claims notices, to AA "for forwarding to the insurers." Likewise, AA forwarded communications from the insurers to Goodyear.
The notice documents presented as exhibits by Goodyear further demonstrate that, although Goodyear notified its insurers through AA, it was never understood that Goodyear's communication to AA constituted notice to the insurers. The notice documents demonstrate an established practice of Goodyear contacting AA in writing and requesting it to forward specific attached information to a specific insurer or a group of identified insurers. AA was given no discretion to determine which insurers it would notify; it notified only those insurers that Goodyear instructed it to.
Goodyear often requested that AA provide it with a copy of all correspondence sent to the insurance companies. In one letter to AA, Goodyear wrote, "As is customary, please provide [Goodyear] with copies of correspondence to all insurers." AA then provided Goodyear with copies of its correspondence to the insurers, demonstrating to Goodyear that it had notified all of the insurers, and only those insurers, that Goodyear had instructed it to notify. Goodyear apparently understood that it was required to communicate notice to the insurers themselves as a condition precedent to coverage and it wanted proof of that notification.
There was no evidence presented that any of the insurers had authorized AA to receive notice on its behalf or that Goodyear believed that AA was so authorized. All of the evidence introduced by Goodyear supports a conclusion that Goodyear issued notice of occurrences to its insurers through AA, but that notice was not effective unless and until the insurance companies received it. Thus, reasonable minds could not conclude that notice of an occurrence sent to AA constituted notice to the insurers.
 When Duty to Notify Arose
Another key dispute between the parties is when Goodyear's duty to notify its insurers arose. Unlike the property damage caused by a fire or a traffic accident, the damage caused by Goodyear's disposal practices was hidden under the ground and went undetected for many years. Thus, although not explicitly characterizing their reasoning as such, courts typically apply a discovery rule concept to determine whether the insured notified its insurer of a latent environmental occurrence within a reasonable time. See, e.g., Ormet Primary Aluminum Corp., supra (although groundwater contamination began in the late 1950s, the court focused on points several years later when Ormet "knew" about the contamination).
Consequently, whether the duty to notify has been triggered depends on "`whether the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim.'" OlinCorp. v. Insurance Co. of North America (C.A.2, 1992), 966 F.2d 718,723, quoting Commercial Union Ins. Co. v. International Flavors Fragrances (C.A.2, 1987), 822 F.2d 267, 272. The inquiry focuses on the insured's knowledge of events and the reasonable conclusions based on that knowledge. American Ins. Co. v. Fairchild Industries (C.A.2, 1995),56 F.3d 435, 439.
No one event has been held to trigger the duty to notify the insurer in this type of case, because each case involves different facts and circumstances under which an insured acquires knowledge about its particular latent environmental "occurrence." Nonetheless, the courts have noted the significance of particular events that tend to establish that the insured knew or should have known that there had been an occurrence: notification by the state or federal environmental authorities that the insured may be liable for the costs of cleaning up or containing a contaminated site; communications between the insured and environmental authorities about the contaminated site; cooperation with environmental authorities during their investigation of the site; the insured's act of hiring environmental experts to conduct testing and monitoring or to propose or undertake remedial actions at the contaminated site; and promises by the insured to take corrective action, including proposed settlement agreements with the EPA. See Ormet Primary Aluminum Corp.,supra; Sagendorf v. Selective Ins. Co. (N.J.App. 1996), 679 A.2d 709;Village of Endicott, N.Y. v. Ins. Co. of North America (N.D.N.Y. 1995),908 F. Supp. 115, vacated in part on other grounds on reconsideration (1996), 914 F. Supp. 36; In re Texas Eastern Transmission Corp. PCBLitigation (C.A.3, 1994), 15 F.3d 1249; Canadyne-Georgia Corp. v.Continental Ins. Co. (C.A.11, 1993), 999 F.2d 1547; Avondale Industries,Inc. v. Travelers Indemnity Co. (S.D.N.Y. 1991), 774 F. Supp. 1416.
With these concepts in mind, this Court must determine whether Goodyear's notice to its comprehensive liability insurers was untimely as a matter of law. Because the facts pertaining to the two disposal sites are different, this Court will address them separately.
 Motor Wheel Disposal Site
The circumstances surrounding the Motor Wheel disposal site included many of the significant events that have been found to trigger the duty to notify insurers. Beginning with a letter dated April 3, 1970, the Michigan Department of Natural Resources ("MDNR") contacted Motor Wheel about its disposal practices at the site and the potential impact on the groundwater under it. The letter indicated that environmental geologist John R. Byerley had conducted an investigation of the site and a copy of Byerley's report was enclosed. The MDNR wrote that it wanted Motor Wheel to be "cognizant of the present hazard" and that it would give it "some time to think about the necessary steps that Motor Wheel Company must take to correct the problem." Mr. Byerley's report indicated that the geological composition of the disposal site was porous and that the site was underlain by a major aquifer that fed the water supply for the city of Lansing. Mr. Byerly further noted that percolating waters in the area moved more rapidly than in other parts of Lansing. Consequently, Mr. Byerley concluded that the disposal of toxic wastes, chemicals, and waste oil on the property should not be allowed.
Despite the MDNR correspondence, Motor Wheel continued to dispose of wastes on the property. By a letter dated November 6, 1973, the MDNR informed Motor Wheel that its disposal of wastes at the site was in violation of state law and that it should cease dumping at the site. The MDNR later agreed to allow Motor Wheel to continue dumping inert materials such as concrete, bricks, and clean sand and dirt. In a letter dated April 20, 1979, however, the Ingham County Health Department ordered Motor Wheel to cease dumping altogether.
In June of 1981, the EPA issued a hazardous waste notification form to Goodyear about the Motor Wheel site. Apparently in response to that notification, Goodyear retained environmental experts to conduct an investigation of the site. Goodyear's investigation of the site continued for the next ten years.
Through a letter dated December 7, 1982, the MDNR notified Goodyear that the groundwater under the Motor Wheel site was contaminated and that Goodyear would be required to develop and implement a remedial program. Knowing that it would be required by the state to clean up the site, by that point, Goodyear knew that there had been an occurrence and it had a duty to notify its insurance carriers.
Goodyear contacted AA about the Motor Wheel site on April 11, 1983, but requested only that it forward notice to its environmental insurance carrier. According to the notice documents presented by Goodyear, it was another sixteen months before Goodyear instructed AA to notify any of its CGL carriers. Through a letter dated August 31, 1984, Goodyear requested that AA send notice to Travelers and Aetna, which it did.
Goodyear's duty to notify its insurers about an occurrence at the Motor Wheel site arose, at the latest, in December of 1982 when the MDNR notified it that the groundwater was contaminated and that Goodyear would be required to clean up the site. It was not until twenty months later, however, that Goodyear instructed AA to notify the first of its CGL carriers. Delays of even fourteen months in this type of case have been held to be unreasonable as a matter of law. See Indus. Coatings Group v.American Motorists Ins. Co. (Ill.App. 1995), 658 N.E.2d 1338, 1345, overruled on other grounds by Employers Ins. of Wausau v. EhlcoLiquidating Trust (1999), 708 N.E.2d 1122; Avondale Indus., Inc. v.Travelers Indemnity Co. (S.D.N.Y. 1991), 774 F. Supp. 1416, 1430. Given the many events before December 1982 that had given Goodyear reason to believe that it may have caused groundwater contamination, the twenty month delay after the MDNR directly informed Goodyear that it would be responsible for the clean up was unreasonable as a matter of law.
Goodyear suggests that, because the early information it received from the MDNR and the EPA did not identify TCE as the specific groundwater contaminant that it was ultimately required to clean up, its duty to notify its insurers had not yet been triggered. Goodyear cites no legal authority for this argument, however, nor can this Court find any. As this Court explained above, an insured's duty to notify its insurer of an occurrence is triggered when "`the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim.'" Olin Corp., supra. An insured's duty to notify its insurer of an occurrence arises when the insured knew or should have known that it might have caused damages covered by the policy. By December 1982, at the latest, the facts known by Goodyear would have suggested to a reasonable person the possibility of a claim stemming from its contamination of the groundwater. At that time, Goodyear was informed by the MDNR that the groundwater was contaminated and that it would be responsible for the clean up. The fact Goodyear may not have known the specific type or extent of contamination had no impact on whether a claim against it was possible.
Goodyear's notice of occurrence to its primary insurers was late as a matter of law and the insurers were presumed to suffer prejudice by the delay. Goodyear argues, however, that it presented sufficient evidence to rebut the presumption that the insurers were prejudiced by any delay in notice. Specifically, Goodyear presented detailed evidence of the efforts it employed to investigate the contamination problem and potential remediation plans and to reach a cost-effective settlement with the EPA. The Ohio Supreme Court stated in response to a similar argument, however, that such evidence is "speculative at best." Ormet, supra, at 305. It is impossible to determine from this evidence whether the settlement terms might have been more or less costly if the insurers had been given the opportunity to participate from the beginning.
Prejudice presumptively occurs due to the passage of more than forty years since the TCE disposal began. As the Ohio Supreme Court stated inOrmet:
In addition to witnesses who have passed on, memories fade.
* * *
 Other prejudice may result from documents or other evidence being lost or destroyed. In addition, certainly, the physical conditions of the Site have changed significantly over the past twenty years. In addition to opportunities for fraud, options available to the insurance companies rapidly diminish as time passes, leaving them to deal with decisions made by the insured that may not be in either the insured's or insurer's best interest.
Ormet, supra, at 304.
Unlike Ormet and many of the other cases this Court has reviewed in which the relevant occurrences dated back to the 1950s, 1960s, or even 1970s, the relevant polluting activity at the Motor Wheel site occurred during the early 1940s. Investigation of the occurrences would have been difficult even in the 1970s or early 1980s if Goodyear had promptly notified its insurers. A twenty-month delay in notice hampered the investigation even further. There was little documentation still existing, and, not only had witness's memories faded, many witnesses were no longer alive by the time the insurers were notified.
Therefore, as to CGL coverage for the investigation and remediation of the Motor Wheel site, late notice was a valid basis for directed verdict for all of the primary insurers.
 Army Creek Landfill
The events triggering the duty to notify the primary insurers of an occurrence at the Army Creek Landfill are significantly different. Goodyear did not own this disposal site nor did it, according to the evidence presented, have any idea that its wastes were sent there. There is no evidence that Goodyear had any notice of an occurrence at the Army Creek Landfill until the EPA sent it an information request on December 19, 1984.[8] The EPA requested information on Goodyear's disposal of hazardous wastes at either the Army Creek Landfill or another Delaware landfill.
Initially, Goodyear did not know whether it had any involvement at either disposal site because it had no records to indicate where its wastes had been sent during the 1960s. Nonetheless, through a letter dated January 7, 1985, it contacted AA and requested that it forward the EPA notice to Travelers and Aetna. AA forwarded the information to both insurers by the middle of January. Thus, both primary insurers were notified of the occurrences less than one month after Goodyear first learned of them. Reasonable minds could have found that Goodyear timely notified its primary insurers. Therefore, as to the Army Creek Landfill, late notice was not a viable basis for a directed verdict for the primary insurers.
To summarize, this Court has determined that a directed verdict was properly granted on all claims stemming from the Motor Wheel site and all claims for excess insurance coverage based on the Army Creek Landfill. Consequently, this Court will address the remaining directed verdict grounds insofar as they pertain to the Army Creek Landfill and the primary CGL policies issued from 1964 through 1976.
 C. Expected/Intended Pollution Exclusion
Goodyear's fourth assignment of error is that the trial court improperly granted a directed verdict to the insurers based on the so-called "expected or intended" pollution exclusion, which, if demonstrated, would disclaim liability for the insurer. This type of pollution exclusion existed in only six of the remaining policies, the Travelers' policies issued from 1971 through 1976. The relevant portion of the pollution exclusion provided as follows:
This insurance does not apply:
* * *
 O. to bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant
 (1) if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of the insured * * *[.]
Travelers moved for a directed verdict based on this exclusion, asserting that the facts were undisputed that Motor Wheel intentionally disposed of its wastes at the Motor Wheel site; therefore, it expected or intended to "discharge * * * waste[.]" Travelers focused on the initial placement of the waste at the disposal site as the relevant "discharge." Goodyear, in opposition to Travelers' motion for directed verdict, contended that the relevant discharge was not the placement of wastes at the disposal site. Instead, it asserted that the relevant "emission, discharge, seepage, release or escape" of wastes or pollutants was the migration of chemicals from the disposal site and into the groundwater.
Although there is authority to support the position of each party, this Court is more persuaded by the position set forth by Travelers. Although most of the cases that have addressed this issue have done so within the context of the sudden and accidental pollution exclusion,[9] this Court finds that the reasoning applies with full force to this aspect of the expected or intended pollution exclusion because the language of the two provisions is similar. The sudden and accidental exception to the pollution exclusion allows an exception from the standard pollution exclusion for pollution damage caused by a "discharge, dispersal, escape, or release" of waste or pollutants into or upon land if such discharge, dispersal, escape, or release was sudden and accidental.
Although Travelers maintains that the Supreme Court of Ohio addressed the relevant discharge issue within the context of the sudden and accidental exclusion in Hybud Equip. Corp. v. Sphere Drake Ins. Co. (1992), 64 Ohio St.3d 657, it did not. The court in Hybud implied that the relevant discharge was the initial placement of wastes in the landfill, but the issue was not raised by either of the parties and, consequently, it was not decided by the court. Although Hybud is not controlling here, it provides some support for Travelers' position.
The Second District Court of Appeals did directly address the discharge issue and found that the focus of the sudden and accidental pollution exclusion is the initial disposal of foundry sand onto the land, not the subsequent migration of contaminants from the sand into the groundwater. See Emp. Ins. of Wausau v. Amcast Indus. Corp. (1998), 126 Ohio App.3d 124,131. The court in Amcast Indus. Corp. focused on the release or discharge as the "polluting activity" for which the company sought coverage. It refused to accept the legal fiction that the contaminants were "stored" in the foundry sand and later "released" into the groundwater. Id. at 131. This same rationale applies to Goodyear's implicit argument that, when Motor Wheel's wastes initially were deposited in the Army Creek Landfill, the wastes were stored there until the contaminants were later "released" into the environment and ultimately into the groundwater.
Courts in many other jurisdictions have likewise refused to accept the argument that landfills served as "containers" from which pollution later unintentionally and unexpectedly seeped. See, e.g., Syntex Corp. v.Lowsley-Williams Cos. (Cal.App. 1998), 79 Cal.Rptr.2d 371, 378-379;Travelers Casualty Surety Co. v. Superior Court (Cal.App. 1998),75 Cal.Rptr.2d 54, 66; LaFarge Corp. v. Travelers Indemnity Co. (C.A.11, 1997), 118 F.3d 1511, 1518; E.I. duPont De Nemours and Co. v. AdmiralIns. Co. (Del.App. 1995), 711 A.2d 45, 64-65; St. Paul Fire MarineIns. Co. v. Warwick Dyeling (C.A.1, 1994), 26 F.3d 1195, 1204; Damar v.United States Fire Ins. Co. (N.D.Ga. 1993), 856 F. Supp. 679, 682.
Motor Wheel's wastes were not placed into any kind of container at the Army Creek landfill; they were simply placed on the ground and, eventually, covered with earth. The disposal of plant trash at the Army Creek landfill constituted a discharge of wastes directly into the environment. As one court aptly noted, the focus of the EPA's investigation was the initial placement of wastes at the landfill, not the landfill's failure to contain the wastes. See St. Paul Fire Marine, supra, at 1204. The EPA has never viewed landfills as containers, nor has it ever indicated that there were subsequent releases from the landfill into the environment. Id.
Moreover, shifting the focus from the initial disposal of wastes to some later seepage from the landfill is "merely an attempt to recast damages * * * as a separate discharge." Id. "The environmental damage is essentially coterminous with the so-called `release' of hazardous substances from the landfill to the environment." Id. To focus on such a secondary discharge "dangerously blurs the distinction between `intentional discharge' and `intentional damage.'" DuPont, supra, at 66. If this provision only excluded pollution damage that was unexpected and unintended, it would merely duplicate the occurrence definition that already existed in all policies. An insurance policy provision should not be construed so as to have no effect. See Stith v. Milwaukee GuardianIns. (1988), 44 Ohio App.3d 147, 148.
The evidence was undisputed that Motor Wheel intentionally disposed of its plant trash during the relevant period and that it expected that the wastes would be discharged onto the ground at a disposal site. Reasonable minds could only conclude that this insurance policy exclusion precluded recovery for property damage stemming from Motor Wheel's disposal of plant trash at the Army Creek Landfill. Therefore, the trial court did not err in granting a directed verdict to Travelers on the six primary policies issued from 1971 through 1976.
At this point, the only claims remaining are those stemming from liability at the Army Creek Landfill based on the primary policies issued from 1964 through 1970. Consequently, this Court will address the remaining directed verdict grounds insofar as they pertain to the Army Creek Landfill and those policies.
 D. Failure to Cooperate
Several of the policies included a provision that required Goodyear to give its insurers the opportunity to participate in any settlement negotiations. There was no argument made, or evidence before the trial court, that Goodyear failed to cooperate with any of its primary carriers regarding the claims stemming from the Army Creek Landfill. Consequently, this was not a valid basis for a directed verdict as to those claims.
 E. Lost Policies
Aetna further asserted in support of its motion for directed verdict that Goodyear failed to prove that it had coverage under a 1964 primary policy because it failed to produce a copy of the policy.[10] Goodyear contends that it produced enough evidence to survive a directed verdict on the 1964 Aetna primary policy. This Court agrees.
Goodyear introduced the following evidence to demonstrate that it had coverage under the 1964 Aetna primary policy, number 1AL29794SRY: (1) the declarations page for the policy; (2) correspondence from Aetna to indicate that Goodyear had coverage under a policy number 1AL29794SRY; (3) testimony that coverage under the 1964 primary policy, as well as a missing 1963 primary policy, "would have been the same as the policies issued in the preceding year and the following year issued by Aetna Casualty to Goodyear[;]" and (4) copies of the primary policies issued by Aetna to Goodyear in 1962 and 1965. From this evidence, reasonable minds could conclude that Goodyear had coverage, and could also discern the terms and conditions of that coverage, under primary policy number 1AL29794SRY, issued by Aetna in 1964. See Helman, supra, at 622 (summary judgment for insurer inappropriate where insured presented copies of the insurer's standard "form" insurance policies and affidavit testimony to indicate that the insured purchased standard form coverage from the insurer). Therefore, it would have been improper for the trial court to grant Aetna a directed verdict simply because Goodyear could not produce a copy of the specific policy.
 F. No Accident or Occurrence
Another ground asserted for directed verdict was that Goodyear had failed to prove that there had been a qualifying "accident" or "occurrence." Each of Goodyear's general liability policies provided for coverage of either an accident or occurrence, which included exposure to conditions that resulted in property damage that was not expected or intended from the standpoint of the insured. The insurers argued below and on appeal that Goodyear should have expected property damage to result from its waste disposal practices, but they focused this argument almost entirely on the Motor Wheel disposal site.
As to the Army Creek Landfill, the evidence presented at trial was that, at the time Motor Wheel disposed of the phosphate sludge, it believed that it was completely safe to send it for disposal with the general plant trash. It was not until the 1980s that Goodyear discovered that the phosphate sludge was harmful or that it had caused damage at the landfill. Reasonable minds could conclude that, at the time Motor Wheel sent the phosphate sludge for disposal during the 1960s, it did not expect or intend any property damage to occur. Therefore, a directed verdict on this basis would have been inappropriate.
 G. Known Loss Doctrine
Several insurers moved for directed verdict based on the "known loss doctrine," asserting that once Goodyear acquired knowledge of the occurrences, the losses were not insurable under policies issued after that point. As stated in the appellate brief filed by Aetna and Travelers, "[I]nsurance simply is unavailable for losses that already have occurred, or are substantially certain to occur. * * * The overwhelming majority of courts throughout the nation have adopted this doctrine and have limited insurance coverage to fortuitous or accidental events." Goodyear asserts in its brief: (1) that the "known loss doctrine" is not recognized in Ohio, and (2) that this argument was limited to the Motor Wheel disposal site.
Even if this Court were to find that the known loss doctrine is viable in Ohio, the insurers' argument is based almost exclusively on Goodyear's knowledge about the Motor Wheel site. The insurers do not articulate much of a known loss argument pertaining to the Army Creek Landfill because the evidence does not support it. As this Court noted in the late notice and "occurrence" arguments discussed above, there was no evidence that Goodyear had any knowledge that there had been an occurrence at the Army Creek Landfill until December 1984, by which time it had become self-insured at the primary level. Thus, the known loss doctrine was not a proper basis for directed verdict as to the Army Creek Landfill and the primary CGL policies.
 H. Pre-acquisition Coverage
Finally, the insurers with whom Goodyear held CGL policies prior to 1964, when Goodyear acquired Motor Wheel, asserted that their policies did not insure against the risks and losses of Motor Wheel that occurred before Goodyear acquired the company. This Court has determined that all pre-1964 policies were properly disposed of, on other grounds, by a directed verdict. Thus, this issue has become moot and will not be addressed.
 Directed Verdict Summary
This Court overrules in part and sustains in part Goodyear's challenge to the directed verdict granted to all defendants. Having addressed all grounds asserted for directed verdict, this Court determines that a directed verdict was proper on all coverage issues related to the Motor Wheel Disposal Site and on all excess insurance policies and on claims stemming from the 1971 through 1976 primary policies. To that extent, Goodyear's second through ninth assignments of error are overruled. There was no valid basis, however, to support a directed verdict on claims related to the Army Creek Landfill based on the 1964 through 1970 primary CGL policies. To that extent, Goodyear's second through ninth assignments of error are sustained.
 II. Continuation of Trial After Disability of Judge
Goodyear's first assignment of error is that the trial court erred by failing to grant its request for a new trial after the original visiting judge assigned to the case became unable to proceed with the trial. Assignment of a successor judge after a trial is commenced is governed by Civ.R. 63. Berger v. Berger (1981), 3 Ohio App.3d 125, 129. Although this case was tried to a jury, Goodyear's equitable claims were tried to the court. Goodyear contends, therefore, that assignment of a successor judge to hear this case was governed by both sections of Civ.R. 63. Civ.R. 63((A) and (B) provide, in relevant part:
 (A) * * * If for any reason the judge before whom a jury trial has commenced is unable to proceed with the trial, another judge, designated by the administrative judge, * * * may proceed with and finish the trial upon certifying in the record that he has familiarized himself with the record of the trial; but if such other judge is satisfied that he cannot adequately familiarize himself with the record, he may in his discretion grant a new trial.
 (B) If for any reason the judge before whom an action has been tried is unable to perform the duties to be performed by the court after the verdict is returned or findings of fact and conclusions of law are filed, another judge designated by the administrative judge * * * may perform those duties; but if such other judge is satisfied that he cannot perform those duties, he may in his discretion grant a new trial.
Goodyear's argument under Civ.R. 63(A) is that the successor judge, Judge Feighan, abused his discretion by failing to grant a new trial because he did not adequately familiarize himself with the record. By the explicit terms of Civ.R. 63(A), the determination of whether the successor judge has adequately familiarized himself with the record and, therefore, whether he is able to proceed with the trial, lies within his sound discretion. The record indicates that Judge Feighan was provided with transcripts of the witness testimony he missed. Judge Feighan certified at the hearing on Goodyear's motion for a new trial that he had familiarized himself with the record. The certification requirement guarantees that a successor judge has sufficient familiarity with the case to fulfill his duty competently. Hartt v. Munobe (1993),67 Ohio St.3d 3, 8.
Civ.R. 63(B) authorizes substitution of the judge only after a verdict has been returned to prevent a replacement of the trier of fact in the middle of a trial with someone who has had no opportunity to observe the demeanor of the witnesses and to assess their credibility. See Welsh v.Brown-Graves Lumber Co. (1978), 58 Ohio App.2d 49, 51. Where witness credibility is not a factor, the parties are not prejudiced by the replacement. See Id. Because Judge Feighan granted the defendants directed verdicts, he made no factual findings and necessarily construed all evidence in Goodyear's favor. An assessment of the credibility of witnesses was not a factor in this case. Therefore, Goodyear was not prejudiced by the replacement of the trial judge. Goodyear's first assignment of error is overruled.
 III. Partial Summary Judgment
Goodyear's tenth assignment of error is that the trial court erred in granting summary judgment to those insurers whose policies included "sudden and accidental" pollution exclusions. The trial court found that, under the policies including such a provision, there was no duty to defend or indemnify Goodyear. Although, in the trial court, Goodyear asserted that these insurers had the duty to defend and indemnify, it has abandoned its indemnity argument on appeal. Goodyear now asserts that the "sudden and accidental" pollution exclusions did not relieve these insurers from their duty to defend Goodyear.
Pursuant to Civ.R. 56(C), summary judgment is proper if:
 (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party.
State ex. rel. Howard v. Ferreri (1994), 70 Ohio St.3d 587, 589. Doubts must be resolved in favor of the nonmoving party. Horton v. HarwickChem. Corp. (1995), 73 Ohio St.3d 679, 686.
Each of the policies at issue included an exclusion for damage arising out of "the discharge, dispersal, release or escape of * * * pollutants into or upon land, the atmosphere or any watercourse or body of water." The pollution exclusion did not apply, however, "if such discharge, dispersal, release or escape [was] sudden and accidental." As Goodyear was seeking coverage from damage arising from "pollution," it had the burden of establishing that the pollution fell within the "sudden and accidental" exception to the policies' pollution exclusions. See U.S.Industries, Inc. v. Ins. Co. of N. Am. (1996), 110 Ohio App.3d 361, 366.
The burden is on the policyholder to establish that the exception to the pollution exclusion applies. Id.,citing Plasticolors, Inc. v.Cincinnati Ins. Co. (1992), 85 Ohio App.3d 547, 550. Although Goodyear has focused its argument on the accidental, unintentional nature of its act of causing the pollution, it downplays the significance of the additional requirement that the pollution be sudden. The "sudden and accidental" exception to the pollution exclusion clause covers only "those damages caused by an abrupt release." U.S. Industries, Inc.,supra, at 366, citing Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.
(1992), 64 Ohio St.3d 657, 667.
Whether an insurer has a duty to defend is determined by looking at the allegations in the complaint. Great Am. Ins. Co. v. Hartford Ins. Co.
(1993), 85 Ohio App.3d 815, 818. The duty to defend may arise from the complaint alone if the allegations in the complaint clearly bring the action within the coverage of the policy. See Motorists Mut. Ins. Co. v.Trainor (1973), 33 Ohio St.2d 41, paragraph two of the syllabus. However, when the duty to defend is not readily apparent from the pleadings, "but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim." Willoughby Hills v.Cincinnati Ins. Co. (1984), 9 Ohio St.3d 177, syllabus.
In its motion for reconsideration, Goodyear correctly notes that the proper focus in this analysis is on the underlying complaints filed against Goodyear, not Goodyear's complaint for declaratory judgment. Goodyear further indicates, however, that these complaints were admitted as exhibits at trial. This Court will not look at evidence admitted at a subsequent trial, however, to determine whether a motion for summary judgment was properly granted. The only evidence that this Court will review is the evidence that was before the trial court on summary judgment.
Although the record suggests that Goodyear may have filed such complaints with its opposition to summary judgment, those complaints are not attached to the summary judgment materials filed in this Court. If Goodyear did in fact file the underlying complaints with its opposition to summary judgment, it should have sought to supplement or correct the record pursuant to App.R. 9. "It is the duty of the appellant * * * to ensure that the record filed in the court of appeals actually includes all that is necessary to the appeal." Loc.R. 5(A) of the Ninth District Court of Appeals.
Even if the underlying complaints were part of the summary judgment materials filed with this Court, the only language that Goodyear pointed to in opposition to summary judgment was that the complaints filed against it alleged claims based on "releases." Although Goodyear asserted in its brief in opposition to summary judgment that the word "releases" "clearly connotes abruptness or a temporal element[,]" it cited no authority for that statement and this Court knows of none. The word "release" in this context means a discharge from restraint or confinement, with no temporal aspect attached to that meaning. See Webster's Third New International Dictionary (1993) 1917. In fact, because a "release" could be sudden or gradual, or something in between, the sudden and accidental exception to the pollution exclusion modifies the term "release" with the terms "sudden" and "accidental."
Thus, the term "releases" in the underlying complaints did not even arguably bring those claims within the sudden and accidental exception to the pollution exclusion. Reasonable minds could only conclude that coverage was precluded under those policies that included such a provision. Therefore, summary judgment as to those policies was appropriate. Goodyear's tenth assignment of error is overruled.
 IV. Summary
Goodyear's assignments of error regarding the granting of directed verdicts to all defendants are sustained insofar as they pertained to the primary CGL policies issued from 1964 through 1970 and the Army Creek Landfill. The remainder of Goodyear's assignments of error are overruled. The judgment of the trial court is affirmed in part and reversed in part and the cause is remanded for proceedings consistent with this opinion.
Judgment affirmed in part and reversed in part and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Summit, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed equally to both parties.
Exceptions.
 ___________________________ DONNA J. CARR
BAIRD, P. J. CONCURS
[1] Goodyear's evidence was not consistent on this point. There was testimony that TCE was used at the plant only during the 1940s, but there was also evidence to suggest that TCE use continued beyond that time.
[2] Although some policies use a different term such as "accident," the term "occurrence" will be used throughout this opinion.
[3] Although one of the original appellees, Liberty Mutual Insurance Company, also filed a cross-appeal, that party was later dismissed from the case.
[4] This Court does not decide whether Goodyear's self-insurance coverage after 1985 would be applicable to the environmental claims because no argument or evidence to that effect was offered at trial.
[5] Although the insurers also argued that there was no qualifying "occurrence" at the Motor Wheel site, the lack of an occurrence would preclude coverage under any of the policies. Thus, for the purposes of determining whether Goodyear proved attachment of the excess policies, this Court will assume that there was a qualifying occurrence.
[6] Again, for purposes of this discussion, this Court will assume that the damages caused by the seepage of chemicals from each disposal site constituted covered occurrences.
[7] No party has asserted that AA failed to notify an insurer after Goodyear instructed it to do so. The issue is whether Goodyear's communication to AA to notify a specific insurer or insurers constituted notice to all insurers.
[8] Although Travelers' brief asserts that Goodyear knew of the groundwater contamination in the 1970s, there is no evidence that Goodyear was aware of the groundwater contamination or that it or Motor Wheel had any connection to that environmental damage.
[9] See the discussion of the alleged error relating to partial summary judgment, infra, for a further explanation of the sudden and accidental exception to the pollution exclusion.
[10] Although several other policies were lost or missing, this Court has already determined that a directed verdict was properly granted as to those policies on other grounds. Thus, this assignment of error is moot as to all other missing policies.